# PATERNITY OF CHERYL.[1]

Suffolk. February 5, 2001. - April 24, 2001.

Present: MARSHALL, C.J., GREANEY, COWIN, & SOSMAN, JJ.

*Paternity. Practice, Civil,* Relief from judgment. *Rules of Domestic Relations Procedure.*

Motions brought under Mass. R. Dom. Rel. P. 60 (b) (5) to vacate a judgment of paternity based on genetic tests, filed five and one-half and six years after the paternity judgment was entered, were not timely, given the compelling public interest in the finality of paternity judgments; and, in circumstances in which the father and child had a substantial parent-child relationship and in which the father had failed to challenge the paternity judgment at the earliest reasonable opportunity, where the child's interests outweighed any interest of the father [29-34]; further, the Legislature's clear intent expressed in G. L. c. 209C, § 11, as amended, is to limit the ability of a voluntary signatory to a paternity agreement to challenge that agreement at a later time [39].

A motion for relief from judgment brought under Mass. R. Dom. Rel. P. 60 (b) (6) was not only untimely, but inapposite, where the proffered requests for relief clearly fell under subsections (1), (2), (3) or (5) of the rule. [34-35]

The nondisclosure, if any, of fact by a mother to a putative father, an adverse party in the context of a paternity action, did not amount to a "fraud on the court" such as would have, on timely application, warranted relief from a judgment of paternity pursuant to Mass. R. Dom. Rel. P. 60 (b) [35-36].

CIVIL ACTION commenced in the Suffolk Division of the Probate and Family Court Department on November 10, 1993.

Motions to vacate or amend judgment of paternity, filed on June 1, 1999, and January 27, 2000, were heard by *John M. Smoot*, J.

The Supreme Judicial Court granted an application for direct appellate review.

---

[1]The action was brought by the child support enforcement division of the Department of Revenue (department) on behalf of the mother.

The department did not take an appeal from the judge's order. We acknowledge amicus briefs filed in support of the mother by the department and The Children's Law Center of Massachusetts, Inc.

*Pauline Quirion* (*Kelly A. Leighton* with her) for the mother.
*Thomas J. Conroy* for the father.

*Thomas F. Reilly*, Attorney General, & *Amy Spector*, Assistant Attorney General, for Department of Revenue, Child Support Enforcement Division, amicus curiae, submitted a brief.

*Brigid Kennedy-Pfister* for Children's Law Center of Massachusetts, Inc., amicus curiae, submitted a brief.

MARSHALL, C.J. We consider in this case whether a father may move to set aside a judgment of paternity when, more than five years after he voluntarily acknowledged paternity, genetic tests established that he was not the child's biological father. A judge in the Probate and Family Court concluded that the father could seek relief from the paternity judgment under Mass. R. Dom. Rel. P. 60 (b) (5) (West 2001), which provides relief where "it is no longer equitable that the judgment should have prospective application." Rule 60 (b) also provides that any request for relief must be made "within a reasonable time." The judge's order was stayed pending appeal. The mother appealed, and we granted her application for direct appellate review. See note 1, *supra*. We conclude that in this case the father did not request relief within a reasonable time: he declined an offer by the child support enforcement division of the Department of Revenue (department) to undergo genetic testing before he acknowledged paternity, and he waited several years before first challenging the paternity judgment, during which time, by his own admission, he had reason to believe he was not the child's father. Like other courts that have considered the question, we decline to hold that, whenever a father establishes that he is not the child's biological parent, relief from the obligations of paternity is automatically available. Because of the decision we reach, we need not decide whether the 1998 statute enacted by our Legislature that limits any permissible challenge to paternity to one year from the date of the paternity judgment should be applied retroactively to this case. See G. L. c. 209C, § 11, as amended through St. 1998, c. 64, § 227 (approved March 31, 1998).[2] The judgment of the Probate and Family Court is

---

[2]General Laws c. 209C, § 11, as amended through St. 1998, c. 64, § 227, provides in pertinent part that "[u]nless either signatory [to a voluntary

vacated, and the case remanded for further proceedings consistent with this opinion.

I

The mother gave birth to the child (Cheryl) on August 29, 1993. In November, 1993, the department filed a complaint in the Probate and Family Court against the father on behalf of the mother and the Department of Public Welfare (now the Department of Transitional Assistance), seeking to establish his paternity. G. L. c. 209C; G. L. c. 119A, § 3.[3] The department also sought to require the father, who was not married to the mother, to pay child support and maintain health insurance for Cheryl and to reimburse the department for past support it had provided to Cheryl. In December, 1993, the department moved for a temporary order of support and for an order that the father,

acknowledgment of paternity] rescinds the acknowledgment within 60 days of the date of signing as provided in this section, the acknowledgment shall establish paternity as of the date it has been signed by such putative father and mother and shall have the same force and effect as a judgment of paternity, subject to challenge within one year only on the basis of fraud, duress or material mistake of fact . . . ."

[3]In 1993, when the department filed its complaint, G. L. c. 119A, § 3 (5), inserted by St. 1986, c. 310, § 10B, provided in pertinent part that the department was authorized to "use any method available to a private party to collect support, including [that] if no action is pending or has been adjudicated, the [department] may file an action to establish paternity and support pursuant to [c. 209C] or a civil action to establish support pursuant to [c. 209, § 32F]." As a condition of receipt of Federal funding, the Commonwealth's plan to provide aid and services to needy children was required to provide that, as a condition of eligibility for aid, "each applicant or recipient will be required . . . to cooperate with the State . . . in establishing the paternity of a child born out of wedlock with respect to whom aid is claimed." 42 U.S.C. § 602 (a)(26)(B)(i) (1994).

In 1995, the Legislature enacted a statute requiring the Department of Transitional Assistance, on whose behalf the department brought the complaint in this case, to "impose the sanction required by federal law for any applicant or recipient of public assistance who fails, without good cause as defined by federal law, to cooperate and to continue to cooperate with the [department] . . . to establish paternity or to establish, modify or enforce a child support order." G. L. c. 18, § 18A, inserted by St. 1995, c. 5, § 20. Effective May 2, 1997, the department promulgated regulations requiring that an applicant for public assistance for a child make a "good faith effort" to provide to the department "sufficient verifiable information about [a child's] noncustodial parent" as a condition of receipt of financial assistance for the child. 830 Code Mass. Regs. § 18.18A.1(3)(a)-(c) (1997).

the mother, and Cheryl submit to genetic marker testing and blood grouping. The latter motion was served on the father, made specific reference to particular tests to be conducted by a named biomedical laboratory, and sought reimbursement from the father for the costs of administering the tests, but only in the event that the tests identified the defendant as the father of Cheryl. The department did not require the father to pay for the tests in advance.

On December 16, 1993, the mother and the father executed an acknowledgment of parentage in which the father acknowledged that he was the father of Cheryl, that he understood his acknowledgment would have the effect of a judgment against him, and that the acknowledgment would obligate him to support Cheryl. He acknowledged that his execution of the agreement was his free act and deed. The father also executed a support agreement whereby he agreed to pay child support in the amount of $56.50 each week for Cheryl's benefit. The mother, in turn, acknowledged and affirmed that he was the father of Cheryl. That same day, a judge in the Probate and Family Court entered a judgment of paternity. The father, who was not represented by counsel at the time, did not submit to genetic marker testing prior to the entry of the paternity judgment. Nothing in the record explains why.[4]

The mother and the father apparently were never married.[5] In the years following the entry of the paternity judgment, the father behaved as though he were Cheryl's father. He and his family visited and bonded with Cheryl. In 1995 and again in 1996, the father, acting pro se, sought successfully to expand

[4] In an affidavit, the mother averred that the department offered the father a blood and genetic marker test at a hearing on December 16, 1993, the date he signed the acknowledgment of paternity, but the father declined the offer. There is no affidavit or other explanation by the father claiming, for example, that he did not know that the tests were available to him, that he believed that he was required to, but could not afford to, pay for the tests, that he did not understand the nature of the proceedings, or that there was any other reason why he declined to be tested.

[5] There is no indication in the record that the father and mother were living together around the time of Cheryl's conception or when the paternity judgment was entered, nor is there any indication that they have ever done so.

and enforce his visitation rights with his daughter.[6] According to the mother, Cheryl, now seven years old, has always called the father "Daddy" and "is bonded to and loves [him] as her father." Cheryl also has a relationship with the father's parents and siblings, whom she knows as her grandparents, aunt, and uncles. The judge also noted that the father has fostered "a substantial relationship" with Cheryl.[7] From December, 1993, the father has regularly paid child support to the mother on Cheryl's behalf.

In April, 1999, the department filed a complaint seeking to increase the father's child support obligation, and on May 27, 1999, a Probate Court judge ordered the father to pay $90 per week, an increase of $33.50 each week. Five days later, on June 1, 1999, the father filed for the first time a motion requesting an order for genetic marker testing, and an amendment to the 1993 paternity judgment should the test results warrant it. The motion contained a number of unsworn statements, tending to suggest that he believed he was not Cheryl's biological father. More particularly, and of relevance to this appeal, the father's motion suggested that, as early as Cheryl's birth, he may have had reason to suspect that he might not be Cheryl's biological father.[8] By no later than 1995, when Cheryl was two years old, he had information confirming that fact: He said that, in 1995, two friends of the mother informed him on separate occasions that he was not the father of the child, and that subsequently the mother had said "unequivocally," and in circumstances "indicating sincerity," that he was not Cheryl's father. The motion stated that Cheryl does not resemble the father "in features or skin color," because she is "very light skinned," while he, his parents, Cheryl's mother, and her parents are not light skinned. With his 1999 motion, the father submitted a doctor's

[6]For example, in response to one motion, a Probate Court judge ordered visitation each Saturday and Sunday from 11 A.M. to 6 P.M., a right that the father apparently has exercised consistently.

[7]The judge did not issue any findings of fact. There was no evidentiary hearing, and the record is sparse, with "facts" largely unsupported by affidavits or other sworn testimony.

[8]In his motion to amend the paternity judgment, the father stated that the mother "was known to be sexually active with other men at the relevant time period of conception." It is not clear whether the father knew this when the paternity judgment entered in 1993.

letter stating that laboratory testing of the father's semen conducted in June, 1996, had revealed that he has a low sperm count, with his physician noting that "[t]his finding may explain your problem with infertility . . . ." The motion also stated that, in 1993, the father had acknowledged his paternity "based on misleading information and without the benefit of a paternity test of any kind."

On July 21, 1999, a judge, "after careful review," denied the father's motion for genetic marker testing. Three days later, the father filed a complaint seeking reduction of the increased child support judgment, which was dismissed.

On November 12, 1999, following these unsuccessful attempts to obtain genetic marker testing and a reduction of child support, the father took Cheryl for genetic testing, without the knowledge of the mother. The test report, contained in the record, concluded that he was not the biological father of Cheryl. Relying on the report, on January 27, 2000, the father moved for a second time to amend or to vacate the paternity judgment. He also requested reimbursement for all of the child support that he had paid since the 1993 judgment of paternity. The department and the mother opposed the motion.

On May 30, 2000, following a nonevidentiary hearing, a judge in the Probate & Family Court filed a memorandum and order in which he ordered the mother, the father, and Cheryl to participate forthwith in blood or genetic marker testing,[9] with a status conference to be scheduled after the results were obtained. Relying on *Department of Revenue* v. *W.Z.*, 412 Mass. 718 (1992), the judge said that if the tests established that the father was not the biological parent of Cheryl, he would be entitled to relief from the prospective application of the 1993 paternity judgment, pursuant to Mass. R. Dom. Rel. P. 60 (b) (5),[10] but that he was not entitled to retroactive relief.[11] The judge explained that the father's "interests in no longer being

---

[9]At the hearing, neither the department nor the mother challenged the validity or results of the genetic tests obtained by the father. The department did file a motion to strike all references to the genetic testing, on the ground that the father obtained the genetic tests "in direct contravention" of the judge's order denying the father's request that the judge order such testing.

[10]A judgment of paternity may be set aside "[f]or good cause shown . . . in accordance with rule 60 (b) of the Massachusetts Rules of Domestic Rela-

obligated to support a child not his own" outweighed Cheryl's interests "in maintaining a relationship with someone she believed to be her biological father." He said that a contrary conclusion would prolong "an apparent fraud and falsehood."

## II

The mother argues that the father's generalized attack on the paternity judgment is actually a claim based on fraud, mistake, or newly discovered evidence and, properly construed, should be seen as a claim under Mass. R. Dom. Rel. P. 60 (b) (1)-(3), and not as a claim under Mass. R. Dom. Rel. P. 60 (b) (5). See note 10, *supra.* As such, she argues, the claim is time-barred because the father did not make his motion within one year of the entry of the paternity judgment as required by the rule.[12] She also maintains that, even if relief under rule 60 (b) (5) is available, the father's motions were not timely filed because he did not seek relief "within a reasonable time," as required by rule 60 (b), or within one year of the execution of the paternity agreement as now required by G. L. c. 209C, § 11. See note 2, *supra.*

The father responds that relief was properly granted under

tions Procedure." G. L. c. 209C, § 8. In pertinent part, Mass. R. Dom. Rel. P. 60 (b) (West 2001), provides that a court may grant relief from judgment on any of six grounds: "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59 (b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment."

[11]Neither motion to amend the paternity judgment filed in 1999 and 2000, respectively, sought relief under Mass. R. Dom. Rel. P. 60 (b). At the hearing on his second motion, the father's counsel argued for the first time that relief was warranted under rule 60 (b) (6). Counsel informed the judge that the father did *not* seek relief under rule 60 (b) (1)-(5). While the father now claims that the judge relied on both rule 60 (b) (5) and (6), in granting relief, the record is clear that the judge based his decision solely on rule 60 (b) (5).

[12]Rule 60 (b) of the Massachusetts Rules of Domestic Relations Procedure provides in pertinent part that a motion for relief under that rule must be made "within a reasonable time," except that a motion under subsections (1), (2), and (3) must be brought "not more than one year after the judgment, order or proceeding was entered or taken."

either rule 60 (b) (5) ("it is no longer equitable that the judgment should have prospective application"), or under the catchall provision, rule 60 (b) (6), which authorizes a judge to set aside a judgment "for any other reason justifying relief from the operation of the judgment." He argues that, because he now knows with "scientific certainty" that he is not Cheryl's biological father, the prospective application of the 1993 paternity judgment is no longer equitable. His motion is timely, he says, because he did not discover the mother's "deceit" until he received the results of the genetic marker tests in late 1999.

## A

We consider first the judge's grant of relief pursuant to Mass. R. Dom. Rel. P. 60 (b) (5). We review the judge's decision for an abuse of discretion. See *Department of Revenue* v. *C.M.J.*, 432 Mass. 69, 75 (2000); *Ross* v. *Ross*, 385 Mass. 30, 33-34 (1982). The father's two motions to vacate the paternity judgment, filed in June, 1999, and January, 2000, were filed, respectively, approximately five and one-half and six years after the paternity judgment was entered. To determine what constitutes a "reasonable time" within which to seek relief under rule 60 (b) (5), we look to the individual circumstances of each case.[13] See 11 C.A. Wright, A.R. Miller, & M.K. Kane, Federal Practice and Procedure § 2866, at 382 (2d ed. 1995). As a general matter we agree that challenges to paternity under rule 60 (b) should not be permitted beyond "a relatively brief passage of time." *Nancy Darlene M.* v. *James Lee M.*, 195 W. Va. 153, 157 (1995), quoting *Michael K.T.* v. *Tina L.T.*, 182 W. Va. 399, 405 (1989).

There is a compelling public interest in the finality of paternity judgments. See G. L. c. 209C, § 11, as amended (limiting circumstances in which, and time within which, father may challenge paternity judgment). See also *Department of Revenue* v. *W.Z.*, 412 Mass. 718, 721 (1992); *Anderson* v.

---

[13]Courts have relied on a variety of factors in assessing whether a father's challenge to a paternity judgment has been made "within a reasonable time" under rule 60 (b). See, e.g., *Ex parte State ex rel. J.Z.*, 668 So. 2d 566, 571 (Ala. 1995) (factors include "the interest in finality, the reason for delay, the practical ability to learn earlier of the grounds relied upon, and the prejudice to the other parties").

*Anderson*, 407 Mass. 251, 255-256 (1990).[14] Where a father challenges a paternity judgment, courts have pointed to the special needs of children that must be protected, noting that consideration of what is in a child's best interests will often weigh more heavily than the genetic link between parent and child. See, e.g., *Ex parte State ex rel. J.Z.*, 668 So. 2d 566, 569 (Ala. 1995) ("policy in favor of finality [of paternity judgments] means that a prior adjudication should not be subject to relitigation in the absence of truly compelling circumstances"); *Richard B. v. Sandra B.B.*, 209 A.D.2d, 139, 141 (N.Y. 1995), quoting *Ettore I. v. Angela D.*, 127 A.D.2d 6, 13 (N.Y. 1987) ("unequivocal trend" has been to "zealously safeguard the welfare, stability, and best interests of the child by rejecting untimely challenges affecting his or her legitimacy"); *Godin v. Godin*, 168 Vt. 514, 523 (1998), and cases cited (noting that many courts have rejected attempts to reopen paternity judgments based on postjudgment blood tests "absent clear and convincing evidence that it serves the best interests of the child"). Like those courts, we have recognized that stability and continuity of support, both emotional and financial, are essential to a child's welfare. See, e.g., *Adoption of Willow*, 433 Mass. 636, 647 (2001), and cases cited; *Gray v. Commissioner of Revenue*, 422 Mass. 666, 675 (1996), quoting *Duranceau v. Wallace* 743 F.2d 709, 711 (9th Cir. 1984) ("[i]t is hard to imagine a more compelling state interest than the support of its children").[15]

Where a father and child have a substantial parent-child

[14]The Uniform Parentage Act, a proposed uniform statute governing in part the establishment of paternity, expresses the same policy. Section 308 of the latest version of the statute, which was approved in draft form by the National Conference of Commissioners on Uniform State Laws in August, 2000, provides in pertinent part that a signatory to a voluntary acknowledgment of paternity may commence a proceeding to challenge the acknowledgment only within two years of its execution, and only on the basis of fraud, duress, or material mistake of fact.

[15]Social science data and literature overwhelmingly establish that children benefit psychologically, socially, educationally and in other ways from stable and predictable parental relationships. See generally 1 J. Goldstein, The Best Interests of the Child: The Least Detrimental Alternative (1996); Kelly, Using Child Development Research to Make Appropriate Custody and Access Decisions for Young Children, 38 Fam. & Conciliation Cts. Rev. 297 (2000). This holds true even where the father is a noncustodial parent, see Warshak, Social

relationship, as the father and Cheryl apparently have, and the father has provided the child with consistent emotional and financial support, an attempt to undo a determination of paternity "is potentially devastating to a child who ha[s] considered the man to be the father." *Hackley* v. *Hackley*, 426 Mich. 582, 598 n.11 (1986). See *N.A.H.* v. *S.L.S.*, 9 P.3d 354, 364 (Colo. 2000), quoting *McDaniels* v. *Carlson*, 108 Wash. 2d 299, 311 (1987) ("The outcome of a paternity action irrevocably alters a child's current family situation and her future. . . . [I]t is the child who has the most at stake in a paternity proceeding"). It was in part for these reasons that we concluded that a man who has comported himself as a child's father "may be obliged to continue to support the child when he, for the first time, renounces his apparent paternity in an attempt to avoid court-imposed support obligations." *A.R.* v. *C.R.*, 411 Mass. 570, 575 (1992) (addressing whether husband is equitably estopped from denying paternity of child born to his wife). See *C.C.* v. *A.B.*, 406 Mass. 679, 690 (1990) ("substantial relationship" between putative father and child is relevant to father's rights in paternity action).

We assess the reasonableness of the five and one-half year interval between the entry of the paternity judgment in 1993, and the father's first motion for relief filed in 1999, in light of this jurisprudence. In 1993, the father had an opportunity to, but did not seek, genetic testing, and it avails him little to attempt to obviate that fact. He never claimed, and the record, such as it is, does not establish that his decision to acknowledge paternity voluntarily at that time was conditioned solely on his understanding that he was Cheryl's biological father. A man may acknowledge paternity for a variety of reasons, and we cannot assume that biology is the sole impetus in every case. See, e.g., *Godin* v. *Godin, supra.*

Moreover, the father failed to challenge the paternity judgment at the earliest reasonable opportunity, in the face of what

Science and Children's Best Interests in Relocation Cases: Burgess Revisited, 34 Fam. L.Q. 83, 89-96 (2000), or where the stable relationship is with an individual not genetically linked to the child. See S. Golombok, Social versus Biological Parenting: Family Functioning and the Socioemotional Development of Children Conceived by Egg or Sperm Donation, 40 J. Child Psychol. and Psychiatry 519 (1999).

he acknowledges was mounting evidence that he might not be Cheryl's biological father. He took no action in 1995 after he was informed, he says, by friends of the mother that he was not Cheryl's biological father. He took no action after the mother "unequivocally" confirmed, he says, that he was not Cheryl's biological father. He took no action after he observed that Cheryl did not share his, his parents', the mother's, or the mothers' parents' physical attributes. He took no action in 1996 when he discovered that his low sperm count could explain his and his wife's fertility problems. During all those years, Cheryl knew and relied on him as her father, and he enjoyed her love and companionship. See *Wade* v. *Wade*, 536 So. 2d 1158, 1160 (Fla. Dist. Ct. App. 1988) (declining to vacate paternity judgment because father "enjoyed the benefits of his representation as the child's father, including the child's love and affection, his status as father in the place of the natural father, and the community's recognition of him as the father").

It is illuminating that the judge in the Probate and Family Court reached the same decision as do we when first asked to rule on the father's challenge. In 1999, the judge initially denied the father's request for genetic testing, even though the father's motion made clear his belief that he was not Cheryl's biological father. The judge did not (nor was he required to) issue a memorandum explaining his decision, but we may infer that he had in mind the weight of authority enforcing the finality of paternity judgments. The judge granted the father relief only when confronted with the results of genetic testing the father had obtained privately. He did so relying on *Department of Revenue* v. *W.Z.*, *supra* at 721, where we said we "assume[d]" that a father could obtain prospective relief from a paternity judgment pursuant to rule 60 (b) (5).[16]

We differ with the judge because we conclude that, as a consequence of the father's long delay before he challenged the paternity judgment, Cheryl's interests now outweigh any inter-

---

[16]In *Department of Revenue* v. *W.Z.*, 412 Mass. 718, 721 (1992), the father did not raise a claim for prospective relief, and we had no occasion to decide whether rule 60 (b) (5) relief was available to him. The facts in that case were different from those presented here. There the father acknowledged his paternity as part of a guilty plea to a criminal nonsupport charge, and the mother later agreed to genetic marker testing.

est of his. See *Godin* v. *Godin, supra.* Our conclusion is consistent with our prior jurisprudence, and the decisions of numerous other courts, that a father's challenge to a paternity judgment may be untimely even though he may establish conclusively that he is not a child's genetic parent. See *Anderson* v. *Anderson, supra* at 257-258 n.6 (collecting cases denying relief to former husbands). See also *Ex parte State ex rel. J.Z.*, 668 So. 2d 566, 569 (Ala. 1995); *Nancy Darlene M.* v. *James Lee M.*, 195 W. Va. 153, 157 (1995) (collecting cases). But see *Dixon* v. *Pouncy*, 979 P.2d 520, 526 (Alaska 1999) (relief under rule 60 [b] [5] available where genetic test confirms father not biological parent; claim brought two and one-half years after divorce not unreasonable as matter of law).[17]

## B

We next consider the father's motion for relief under Mass. R. Dom. Rel. P. 60 (b) (6), the catchall provision of that rule. See note 10, *supra.* The judge acted well within his discretion in denying the father relief pursuant to that subsection. A motion under subsection (6) must, like subsection (5), be brought within a reasonable time: for all the reasons just discussed, the father's motion was not. Moreover, in order to prevail under subsection (6), the father was required to demonstrate that relief was not available to him under subsections (1) through (5).[18] See *Department of Revenue* v. *W.Z., supra* at 720-721 n.4, citing *Bromfield* v. *Commonwealth*, 400 Mass. 254, 256 (1987);

---

[17]We need not reach the merits of the mother's argument that the father's challenges to the paternity judgment were barred by res judicata because the father here seeks only prospective relief from the paternity judgment. See *Department of Revenue* v. *W.Z., supra* at 721-722; *Anderson* v. *Anderson*, 407 Mass. 251, 255-257 (1990) (suggesting claim for relief from paternity judgment under rule 60 [b] may not be precluded by finding that decree establishing paternity is res judicata). We and numerous other courts have considered claims similar to the one we address here — the attempt by a father to undo a paternity judgment on the basis of genetic tests — and have almost uniformly concluded that the father's claim is barred by principles of issue preclusion. See, e.g., *Department of Revenue* v. *W.Z., supra; Tandra S.* v. *Tyrone W.*, 336 Md. 303, 324 (1994), (collecting cases) (superseded by statute); *Godin* v. *Godin*, 168 Vt. 514, 523 (1998), and cases cited.

[18]In its amicus brief, the department argues that relief from prospective application of a judgment may similarly not be granted under rule 60 (b) (5), where a claim may be properly brought under rule 60 (b) (1)-(3). Because we

*Anderson* v. *Anderson, supra* at 257; *Chavoor* v. *Lewis*, 383 Mass. 801, 805-806 (1981). The father's proffered reasons for relief clearly fall within subsections (1), (2), (3), or (5) of the rule. He has said (or implied) that he acknowledged paternity based on his "mistaken" belief that he was Cheryl's biological father, Mass. R. Dom. Rel. P. 60 (b) (1); that the evidence that he is not Cheryl's biological father is "new," Mass. R. Dom. Rel. P. 60 (b) (2); that the mother committed fraud, deceit, and misrepresentation against him, Mass. R. Dom. Rel. P. 60 (b) (3); and that the prospective application of the paternity judgment is "no longer equitable," Mass. R. Dom. Rel. P. 60 (b) (5). Because his arguments are not requests for relief independent of subsections (1)-(5), he may not seek relief under rule 60 (b) (6). See *Anderson* v. *Anderson, supra* at 256 (challenge to paternity judgment based on genetic marker tests encompassed within rule 60 [b] [2]).

## C

The father argues that his claim is not subject to any time limit under rule 60 (b) because it also provides that "[t]his rule does not limit the power of a court . . . to set aside a judgment for fraud upon the court." The mother committed "fraud on the court," he says, by failing to disclose that he was not the father of Cheryl. We disagree. Even if the mother knew in December, 1993, that the father was not Cheryl's biological father (a proposition not established by this record), her failure to disclose that information to the court would not amount to "fraud on the court."

A "fraud on the court" occurs where "it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Rockdale Mgt. Co.* v. *Shawmut Bank, N.A.*, 418 Mass. 596, 598 (1994), quoting *Aoude* v. *Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989). The doctrine embraces "only that species of

have identified an independent reason for rejecting the father's rule 60 (b) (5) claim, we need not address this broader argument.

fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Pina* v. *McGill Dev. Corp.*, 388 Mass. 159, 165 (1983), quoting *Lockwood* v. *Bowles*, 46 F.R.D. 625, 631 (D.D.C. 1969). A party seeking to demonstrate fraud on the court must prove "the most egregious conduct involving a corruption of the judicial process itself. Examples are bribery of judges, employment of counsel to 'influence' the court, bribery of the jury, and the involvement of an attorney (an officer of the court) in the perpetration of fraud." *MacDonald* v. *MacDonald*, 407 Mass. 196, 202 (1990), quoting *Lockwood* v. *Bowles*, *supra* at 631-632. A party's nondisclosure to an adverse party (assuming that occurred in this case) or to the court (there is no suggestion that occurred here) of facts pertinent to a controversy before the court, without more, does not amount to "fraud on the court" for purposes of vacating a judgment under rule 60 (b). See *Winthrop Corp.* v. *Lowenthal*, 29 Mass. App. Ct. 180, 187 (1990) (nondisclosure of contingent fee agreement did not amount to fraud on court where disclosure required by contract). Cf. *Matter of Neitlich*, 413 Mass. 416, 423 (1992) (finding fraud on court where attorney made false statement "with intent to deceive a court").

## D

We harbor no illusion that our decision will protect Cheryl from the consequences of her father's decision to seek genetic testing and to challenge his paternity. We cannot protect Cheryl from learning about her genetic parentage: If Cheryl does not yet know of her father's challenge, he (or others) may disclose it to her. No judgment can force him to continue to nurture his relationship with Cheryl, or to protect her from whatever assumptions she may have about her father.[19] But we can protect her financial security and other legal rights. It appears that the

---

[19]The father has expressed an intention to continue his relationship with Cheryl, regardless of the outcome of this litigation. His consistent financial support of Cheryl in the past, the relationship he has nurtured with her, and the responsibility with which he has carried out his legal obligations to her

father first challenged his paternity because of the increase of child support ordered in 1999. Relieving him of child support obligations might itself unravel the parental ties, as the payment of child support "is a strand tightly interwoven with other forms of connection between father and child," and often forms a critical bond between them. *Bowen* v. *Gilliard*, 483 U.S. 587, 617 (1986) (Brennan, J., dissenting). We can ensure that Cheryl, who may be deprived of her father's affection and long-held assumptions about her paternity, is not also deprived of the legal rights and financial benefits of a parental relationship. See *Godin* v. *Godin*, *supra* at 525; *Michael K.T.* v. *Tina L.T.*, 182 W. Va. 399, 405 (1989) ("While the law cannot prohibit the putative father from informing the child of their true relationship, it can prohibit him from employing the sanctions of the law to avoid the obligations which their assumed relationship would otherwise impose").

The law places on men the burden to consider carefully the permanent consequences that flow from an acknowledgment of paternity. The judge in this case properly noted that the father has significant interests at stake in the outcome of this litigation, financial and otherwise.[20] We also recognize the anomaly of enforcing the parental obligations of a man who was identified as a parent only (it seems) because the State insisted that the mother name Cheryl's biological father, where he has now established that he is not that man. The State intervened when the mother, in her efforts to obtain public assistance for her child, was required to name her child's biological father. See note 3, *supra*. So far as we can discern from this sparse record, there was not, and has not been since, any ongoing intimate relationship between the mother and the father. Cf. *Anderson* v. *Anderson*, *supra* at 257 n.6, and cases cited (denying relief to former husbands). A different result might be mandated if a man named by a mother in these circumstances had no opportunity

---

may indicate that he will not abandon the child, even though he knows he is not her biological father.

[20]The judge determined that as of May 30, 2000, the father faced future child support payments of over $50,000 based on his then-current earning capacity, and that the father might be ordered to pay continuing support for Cheryl's postsecondary education.

to undergo genetic testing before he acknowledged paternity.[21] A different result might be mandated if a man named by a mother in these circumstances promptly challenged the paternity judgment on obtaining information that he might not be the child's biological father. Cf. *Department of Revenue* v. *W.Z.*, *supra* at 720-721. In this case, even if the father's acknowledgment of paternity were triggered by State intervention (withholding public assistance unless the mother named the father of her child) or misleading information from the mother (assuming she did not name the father in good faith),[22] he had the opportunity to undergo genetic testing, and he waited too long to challenge his paternity.[23]

---

[21]Where the State requires an unmarried woman to name her child's putative father, the department should require that the parties submit to genetic testing prior to the execution of any acknowledgment of paternity or child support agreement. To do otherwise places at risk the well-being of children born out of wedlock whose fathers subsequently learn, as modern scientific methods now make possible, that they have no genetic link to their children. This is consistent with, and gives meaning to, the department's authority to require genetic testing in any case requiring the establishment of paternity based on a mother's or putative father's affidavit that sexual intercourse occurred during the probable period of the child's conception. See G. L. c. 119A, § 3A. It is also consistent with the stated purpose of G. L. c. 209C, the statute governing judgments and acknowledgments of paternity, to ensure that children born out of wedlock receive the same rights and protections as those born to a marriage. See G. L. c. 209C, § 1.

[22]In his memorandum and order, the judge stated that, if it is established that the father is not the biological parent of Cheryl, the mother "was aware, at the time of filing, of the likelihood that a different person was the biological father of [Cheryl]." There is nothing in the record to support that statement. The mother submitted an affidavit stating that she "signed the acknowledgment of paternity and the agreements for judgment in good faith." The father has not challenged her statement, and we see nothing to contradict her assertion. On the basis of mere speculation, we cannot presume as a matter of law that the mother knew that another man had fathered Cheryl, or that she purposefully misled the father in that respect.

[23]Because we conclude that relief is not available under Mass. R. Dom. Rel. P. 60 (b), we need not address the mother's claims that the father's motions for relief are precluded by the doctrine of equitable estoppel and that relief should be denied because the father has brought his motions with "unclean hands." The father apparently obtained the genetic tests on the advice of counsel in 1999. It is, therefore, unlikely that he could be denied relief on the basis of unclean hands. We nevertheless note that the father should have obtained the mother's approval before subjecting Cheryl to the

Our rejection of the father's claim for relief under Mass. R. Dom. Rel. P. 60 (b) is consistent with the Legislature's clear intention to limit the ability of a voluntary signatory to a paternity agreement to challenge the validity of that agreement at some later time. G. L. c. 209C, § 11, as amended.[24] The order of the Probate Court judge is vacated. The case is remanded to the Probate and Family Court for further proceedings consistent with this opinion.

*So ordered.*

---

genetic tests, particularly where, as here, a judge had denied him that relief. The father points out that no judge explicitly prohibited him from obtaining the test, that he took Cheryl for testing during a legal visitation period, and that the test posed virtually no risk of physical pain or trauma for Cheryl. See *A.R.* v. *C.R.*, 411 Mass. 570, 576 (1992), citing *Schmerber* v. *California*, 384 U.S. 757, 771 (1966). Even if the father is correct on each point, absent emergency circumstances, a noncustodial parent must consult with the parent with legal custody of a child before subjecting a child to a medical procedure that may have a significant effect on the child's emotional development. See G. L. c. 208, § 31 (parent with sole legal custody "shall have the right and responsibility to make major decisions regarding the child's welfare including matters of education, medical care and emotional, moral and religious development"). Because the results of a paternity test may, as in this case, lead to protracted paternity litigation, serious conflict between the parents, identity confusion for a child, and an incentive for a parent to withdraw emotional or financial support, the agreement of the child's legal custodian or an order of the court would in most circumstances be required before the noncustodial parent may submit the child to genetic marker and blood group testing years after a paternity judgment has entered.

[24]Because we conclude that relief under rule 60 (b) is not available to the father, we need not reach the mother's claim that relief is precluded by G. L. c. 209C, § 11, as amended, which explicitly limits the circumstances in which a challenge to a voluntary acknowledgment of paternity can be brought. Nor need we consider the father's claim that his motions for relief do not constitute "challenges" for the purpose of G. L. c. 209C, § 11.