Sweeney, Constance M., J.
The plaintiff, Harold Dawson, was severely injured on March 2, 2000, when he sustained a powerful electric shock while repairing a meter and electric box located in a building that was owned by the defendant Holyoke Shopping Center and maintained by the defendant Equity Investment Group Operating Partnership, LP (Equity). Mr. Dawson was acting within the scope of his employment as a serviceman with the City of Holyoke’s Gas and Electric Department (employer) when he sustained his injuries.
The electrical shock and instantaneous electric flash burned the right side of Mr. Dawson’s head and face and severely damaged his right hand and right arm, essentially causing him to lose productive use of his dominant upper limb. Mr. Dawson became necessarily dependent on his left arm, which, in turn, resulted in an impaction injury to his left wrist. The plaintiff underwent numerous operative procedures. Mr. Dawson is now left with permanent suffering from bilateral ulnar neuritis, chronic pain syndrome, and functional impairment to both arms. The electrical shock has impaired his heart function. His physical injuries have taken an emotional toll on him. Mr. Dawson suffers from post-traumatic stress disorder and depression. He also fights an ongoing battle to properly balance the amount of powerful narcotic pain medications he needs to quiet his constant nerve and muscle pain.
Mr. Dawson brought this negligence action seeking damages against the defendants for his injuries. He was married to the plaintiff Cathy Dawson at the time of the accident. They have a minor son, William. Mrs. Dawson and William are plaintiffs under claims for loss of consortium.
The plaintiffs and defendants entered into a settlement agreement sometime before January 2005. However, the agreement was subject to court approval pursuant to G.L.c. 152, §15, because the employer had paid workers’ compensation benefits and, therefore, held a lien under section 15 in excess of Three Hundred Thousand Dollars ($300,000). The court (Velis, J.), heard the plaintiffs “Petition For Approval Of Settlement” on January 12, 2005. The employer opposed the petition on the ground that the plaintiffs’ proposed allocation of the desired settlement proceeds negotiated between the plaintiffs and defendants was designed to circumvent the provisions of section 15 by depriving the employer, as the self-insured compensation carrier, of the reimbursement to which it was presumably entitled for most of the benefits paid to or on behalf of Mr. Dawson. See Walsh v. Telesector Resources Group, Inc., 40 Mass.App.Ct. 227 (1996).
The settlement petition was structured as follows:
Total Settlement Amount: $750,000
Allocations From Total: Plaintiff-employee Harold Dawson $120,000
Plaintiff-spouse (consortium damages) $592,500
Plaintiff-minor child (consortium damages) $ 37,500
*427 The result of the allocations is self-evident. Mr. Dawson, who is the primary plaintiff, was allocated only 16% of the proceeds, while his wife was to receive 79% of the proceeds. As the wife’s recovery is not subject to the section 15 lien, the effect of this seemingly-reverse allocation was that the employer was reimbursed only $78,373 (net amount after adjustments for fees and expenses associated with Mr. Dawson’s allocation) of the more than $300,000 it would ordinarily have been entitled to under section 15.
On January 12 and 13, 2005, Judge Velis heard evidence relating to Mr. Dawson’s injuries, their effect on his marriage, and what harm they had caused his wife and young hearing-impaired son. The parties’ legal arguments were entertained by the court. The plaintiff relied on the case of Hutlin v. Francis Harvey & Sons, Inc., 40 Mass.App.Ct. 692 (1996), wherein the Appeals Court affirmed a trial court approval of a settlement that provided an allocation of 79% of a proposed settlement agreement to the employee’s spouse for consortium damages with the balance allocated to the injured employee. The City of Holyoke, as the self-insured employer, argued that the result in the Hutlin case was based on a unique set of facts — the employee’s comparative negligence had made it clear that he had little or no chance of succeeding on the merits of the tort claim if it were brought to trial. Hutlin, 40 Mass.App.Ct. at 697-98 (noting the success of the wife’s consortium claim, by contrast, would not necessarily have been defeated because of her husband’s comparative negligence). Indeed, the City-employer pointed out that the Appeals Court itself recognized the uniqueness of the facts presented in Hutlin, and the Appeals Court was careful not to cut too broad a swathe through the legislative mandate of section 15.
Judge Velis carefully considered the respective positions of the Dawsons and the City, and, on March 4, 2005, allowed the petition for settlement with the allocations remaining as originally proposed by the Dawsons and the defendants. The City’s objection to the allocations was, in essence, overruled. The allowance of the petition was made by endorsement, unaccompanied by findings.
What Judge Velis did not know, because it did not come to light until some months later, was that Ms. and Mrs. Dawson, and perhaps others representing their interests, had committed fraud on the court and attempted to commit fraud on the employer. The defendants were not part of the fraud. When Mr. and Mrs. Dawson testified under oath before Judge Velis in January 2005, they knew the proposed settlement agreement submitted to him was a sham agreement in so far as the allocations. What, if any, role counsel representing the Dawsons had in perpetrating the fraud is not yet clear. In accordance with the court’s obligation, this decision will be forwarded to the Board of Bar Overseers for further inquiry into what role plaintiffs’ counsel(s) may have played in the fraudulent allocation portion of the section 15 settlement agreement.
What was the fraud and how did it come to the court’s attention? At the time of the approval of the settlement agreement, neither the court, the defendants’ counsel, nor counsel for the City-employer was aware that Mr. and Mrs. Dawson had lied when they testified before Judge Velis regarding the allocations in the proposed settlement agreement. In fact, by January 12,2005, Mr. and Mrs. Dawson had signed an undisclosed agreement in anticipation of a divorce to be filed after the Superior Court approved the fraudulent section 15 agreement — wherein they agreed that their combined proceeds from the fraudulent settlement agreement would be split equally between them. The effect of this sub rosa agreement was to deprive the employer of its reimbursement rights under section 15, and leave the Dawsons with money that by law should have been paid to the Ciiy of Holyoke. Under the court-approved fraudulent settlement petition and agreement, the City-employer received only $78,373 after fees and expenses. If the true agreement had been revealed to the court in January 2005, the court would have known that Mr. Dawson was actually going to receive from his wife an amount that would leave each spouse with $356,250.00 from the settlement, before fees and costs. The net result of the sub rosa agreement, which was entered into by the Dawsons in anticipation of a divorce action, was to deprive the City of Holyoke, as the self-insured employer, of more than $200,000 it is still owed on its lien. Instead, Mr. Dawson tried to pocket, somewhat successfully, the money the City had paid on his behalf and he did so in knowing derogation of his legal obligations. His wife was a willing participant in this scheme. The only true allocation reported in the section 15 settlement agreement was the $37,500 for the son’s loss of consortium.
This fraudulent scheme was brought to the court’s attention in September 2005, when the City of Holyoke moved for relief from judgment after unearthing facts that ultimately proved the fraud. At the time, Judge Velis was on an extended medical leave. Because of the anticipated length of his absence from the court while he recovered from his illness, Judge Velis asked that I, as the Regional Administrative Judge, hear the City’s motion and any opposition thereto.
After examining the court file and reviewing the transcripts of the January hearing before Judge Velis and the written submissions of the parties that addressed the City’s motion for relief from judgment, I conducted an evidentiary hearing. Mr. Dawson testified that he signed the section 15 agreement, knowing that he and his soon-to-be ex-wife had agreed to equally divide her share of the proceeds as fraudulently represented in the section 15 settlement agree *428 ment. Remarkably, Mr. Dawson signed the sub rosa equal-division agreement with his wife the very same day, January 12th, that he appeared before Judge Velis to explain why he, and thus his employer, should receive only 17% of the settlement proceeds while his wife should be entitled to the lion’s share of the proceeds (which, of course, would not be subject to section 15 reimbursement). Other than this admission, however, Mr. Dawson’s testimony was not very helpful since he claimed a loss of memory regarding specific events and discussions, a loss of memory supposedly attributable to the effects of his medication and depression. Attorney Catuogno, one of the Dawsons’ attorneys, testified that she was unaware of the two contradictory agreements. Catuogno also testified that Attorney Lisa Brodeur-McGan worked with her in drafting the section 15 agreement and petition.
The one witness who was very helpful and credible was Attorney Stanley Szlachetka. In August 2004, Mrs. Dawson retained Attorney Szlachetka to represent her in the divorce proceeding she anticipated bringing against her husband. Soon thereafter, Mr. Szlachetka became aware that Attorney Stephen Krevalin was representing Mr. Dawson’s interests in the divorce proceeding. Both attorneys were informed by their respective clients that settlement discussions were underway regarding the Dawsons’ tort lawsuit against the defendants. Since the resolution of those discussions would determine the size of the marital estate, at least in the divorce attorneys’ opinions, the two divorce lawyers agreed that a Joint Petition For Divorce should not be filed until the tort action was resolved.
The divorce attorneys were aware that the Superior Court’s approval was necessary for settlement of the Dawsons’ tort case, but they were under the understanding that the settlement agreement that was to be presented to the Superior Court was in accord with that portion of the division of marital assets attributed to the tort settlement proceeds, which would be presented for approval to the Probate and Family Court when dissolution of the marriage was sought. The divorce attorneys worked out a proposed divorce settlement agreement in or about early November 2005. Based on their respective client’s communications, as well as information Mr. Szlachetka received from Attorney Catuogno, the divorce attorneys waited to file the divorce petition until they received notice from the tort attorneys that the Superior Court had approved the tort settlement agreement. Again, the divorce attorneys did not know that the allocations being represented to the Superior Court were vastly different than the equal distribution the divorce attorneys had been informed of by their clients, and perhaps by one of the Dawsons’ tort attorneys.
Mrs. Dawson did not appear for the evidentiary hearing for relief from judgment, although she was notified of the hearing by her counsel. It was represented to the court that she moved out of the Commonwealth soon after the divorce.
Exactly one week after Judge Velis approved the section 15 agreement that contained the fraudulent allocation provisions, the Dawsons filed ajoint petition for divorce in the Hampden County Probate and Family Court. On June 13, 2005, a Judgment of Divorce Nisi was entered in the Probate and Family Court. The divorce agreement, which was approved by the Probate and Family Court judge, divided the tort proceeds equally between Mr. and Mrs. Dawson based on the sub rosa agreement Mrs. Dawson had signed on January 11, 2005 and Mr. Dawson had signed on Januaiy 12, 2005. Of course, just as Judge Velis was unaware of the sub rosa agreement, the Probate and Family court judge was unaware of the section 15 settlement agreement.
During my involvement in the proceedings, I issued several orders, including attachments on Mr. Dawson’s real estate and a trustee attachment on a bank account where the remaining proceeds Mr. Dawson fraudulently obtained were thought to be on deposit. The presumed trustee has filed an answer that Mr. Dawson does not have any funds in the bank upon which trustee process issued.
I allowed the City of Holyoke’s motion for relief from judgment and informed the parties in open court that the petition for settlement approval, now reopened, would be referred back to Judge Velis for his further consideration.[3]
Mr. Dawson has now discharged Attorney Catuogno and retained new counsel. Mr. Dawson’s new counsel has filed a separate motion to vacate judgment. The motion is moot, since judgment was already vacated by me at the City of Holyoke’s request. However, it is interesting to note that in Mr. Dawson’s motion to vacate judgment he claims that he was “enticed to settle his case on the understanding he would receive about $200,000, however due to the mistake or fraud of his counsel, the workers’ compensation lien ... is now going to be enforced in full against his assets.” Mr. Dawson currently claims that the fraud on the court was perpetrated by his former counsel. That assertion is presumably being thrashed out in discovery occurring in anticipation of Judge Velis’s revisiting the section 15 settlement proposal.
Whether any of the plaintiffs’ attorneys are partially responsible for this shameful event remains to be seen. However, based on the evidence before me, Mr. and Mrs. Dawson have unquestionably perpetrated a fraud on the City of Holyoke in order to line their own pockets with money paid by the City on Mr. Dawson’s behalf, and to which the City is entitled to section 15 reimbursement from Mr. Dawson’s share of the proceeds.
Through their fraudulent acts, the plaintiffs have subverted the essential purpose of G.L.c. 152, §15, which requires the court to review a proposed third- *429 party workers’ compensation settlement agreement “. . . to make sure that ‘(1) the employee’s interests referenced in the statute are protected from being disregarded or unfairly dissipated by a settlement entered into by the insurer, and (2) the insurer’s interests referenced in the statute receive similar protection with respect to a settlement entered into by the employee.’ ” Gagnon v. Shoblom, 409 Mass. 63, 66 (Mass. 1991), quoting DiMartino v. Quality Indus. Propane, Inc., 407 Mass. 171, 176 (1990).
By their lies to the court, Mr. and Mrs. Dawson have caused the insurer, here a municipal government funded by taxpayers’ money, to lose the protection guaranteed by the legislature and enforced by the courts.
Not only have the Dawsons committed a fraud on the City of Holyoke, the evidence is clear and convincing that they have committed a fraud on the court. The Supreme Judicial Court, in the case of In re Paternity of Cheryl 434 Mass. 23, 35-36 (2001), reviewed the “rare species” of events that support a finding of a fraud on the court. At least two of the events are present here. “A fraud on the court occurs where ‘it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system’s ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party’s claim or defense.’ ” In re Paternity of Cheryl 434 Mass. at 35 (citations omitted). “A party seeking to demonstrate fraud on the court must prove ‘the most egregious conduct involving a corruption of the judicial process itself.’ ” Id. at 36 (citations omitted).

ORDER

The employer City of Holyoke’s motion for relief from judgment is ALLOWED and the case is referred back to Judge Velis for further proceedings on the plaintiffs’ original motion for approval of settlement agreement.

 Immediately following the evidentiary hearing, I made detailed findings and rulings on the record. When counsel quite rightly inquired why they had not received a written decision, I checked the record and discovered that, at the end of my ruling, I had informed counsel and the parties that I intended to also produce a separate written decision. I thank counsel for reminding me of that representation and regret any delay occasioned by my lapse.