MT. IVY PRESS, L.P., & another[1] *vs.* MISHA DEFONSECA[2]
& another.[3]

No. 08-P-2132.

Middlesex. November 9, 2009. - November 24, 2010.

Present: KAFKER, WOLOHOJIAN, & MILKEY, JJ.

*Judgment,* Relief from judgment. *Practice, Civil,* Relief from judgment, Motion to dismiss, Fraud, Party pro se. *Fraud.*

In a civil action brought by the plaintiffs, pursuant to Mass.R.Civ.P. 60(b), as an independent action seeking relief from judgment against them in an earlier civil action, the judge erred in allowing, as to one of the two defendants, the defendants' motion to dismiss pursuant to Mass.R.Civ.P. 12(b)(6), where the plaintiffs' rule 60(b) independent action made the requisite showing of an additional ground or reason justifying relief after the expiration of the time limitation provisions of the rule, i.e., that allowing the judgment to stand would be manifestly unconscionable [346-349]; and where, accepting the allegations of the plaintiffs' complaint as a whole and viewing the conduct of one of the two defendants as a whole, which constituted an entire case buttressed by falsehoods, the plaintiffs sufficiently stated a claim of fraud on the court [349-350].

In a civil action brought by the plaintiffs, pursuant to Mass.R.Civ.P. 60(b), as an independent action seeking relief from judgment against them in an earlier civil action, the judge properly allowed, as to one of the two defendants, a motion to dismiss pursuant to Mass.R.Civ.P. 12(b)(6), where the plaintiffs did not allege that the defendant committed any fraud or misconduct, let alone the kind of extraordinary fraud that could justify setting aside an eight year old judgment under rule 60(b)(6). [350-351]

CIVIL ACTION commenced in the Superior Court Department on April 8, 2008.

A motion to dismiss was heard by *Timothy Q. Feeley,* J.

*Brian S. McCormick* for the plaintiffs.

*Frank J. Frisoli, Jr.,* for Vera Lee.

*Misha Defonseca,* pro se.

---

[1]Jane Daniel.

[2]The underlying complaint indicates that Misha Defonseca is also known as Monique De Wael.

[3]Vera Lee.

WOLOHOJIAN, J. After a jury trial in 2002, Misha Defonseca and Vera Lee were awarded more than $30 million in compensatory and multiple damages on claims arising from breaches of contract and violations of G. L. c. 93A by Jane Daniel and Mt. Ivy Press, L.P. (Mt. Ivy).[4] At issue was the publication, distribution, and marketing of Defonseca's life story, Misha: A Memoir of the Holocaust Years.[5] The judgment was affirmed by this court in all respects. *Lee* v. *Mt. Ivy Press, L.P.*, 63 Mass. App. Ct. 538, 562 (2005). Nearly six years after the judgment, Daniel and Mt. Ivy brought an independent action for relief from the judgment under Mass.R.Civ.P. 60(b), 365 Mass. 828 (1974) (rule 60[b]), alleging, in essence, that when confronted with evidence unearthed by Daniel and others, Defonseca admitted that her Holocaust memoir was a hoax. Defonseca and Lee successfully moved to dismiss the complaint under Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974) (rule 12[b][6]), and this appeal followed. We reverse in part and affirm in part.

*Background.*[6] a. *Prior proceedings.* At all material times during the prior trial and appeal, Defonseca held out her story as a true and authentic account of her childhood in Europe during World War II. Broadly sketched, she claimed that as a seven year old child in 1941 she witnessed the Nazis seize her parents. By her account, she fled and managed to avoid capture by the Nazis for more than four years, wandering alone through forests and villages across Europe. She encountered various hardships, including being trapped for a time within the besieged Warsaw Ghetto. Defonseca attributed her survival to her strong will and guile, as well as to the food and protection she received from a wolf pack. *Lee,* 63 Mass. App. Ct. at 539.

Much later, in 1985, Defonseca emigrated to the United States, settling in the Boston area. On occasion she spoke of her experi-

---

[4]A total of $22.5 million was awarded to Defonseca and $9.9 million to Lee.

[5]This published work was introduced in evidence at trial and made available to the jurors for their inspection and review.

[6]The facts are drawn from the plaintiffs' complaint and the proceedings from the prior litigation. See *Jarosz* v. *Palmer*, 436 Mass. 526, 530 (2002). In reviewing the allowance of a rule 12(b)(6) motion to dismiss, we accept as true the fact-based allegations contained in the complaint as well as any favorable inferences reasonably drawn therefrom. *Sullivan* v. *Chief Justice for Admin. & Mgmt. of the Trial Court*, 448 Mass. 15, 20-21 (2006).

ences during the war to different groups in Boston and elsewhere. During a speaking engagement in New York in 1994, Defonseca first met Daniel, who offered to publish Defonseca's autobiography.[7] This offer took hold, and the parties thereafter reduced their agreement to writing.

Since Defonseca's native language was French, Daniel engaged an experienced, professional writer, Lee, a long-standing acquaintance who was fluent in French, to assist (as co-author) on an American edition of Defonseca's memoir.[8] Lee timely provided drafts, including one she believed was approximately eighty percent complete. However, Lee made explicitly clear to Daniel that many facts, including historical facts, would have to be checked. Daniel thereupon removed Lee from the project, falsely telling her that her work was inadequate and the book required rewriting. Daniel also threatened and intimidated Lee so that she would not communicate with Defonseca, and pressured Lee to sign agreements that reduced her share of the proceeds from the book. Litigation ensued, with Lee suing Daniel, Mt. Ivy, and Defonseca.[9] Cross claims and counterclaims followed.

Defonseca and Lee brought a number of claims against Daniel and Mt. Ivy, including breach of contract and violation of G. L. c. 93A.[10] In essence, they alleged Daniel (personally and through

[7]Daniel had formed Mt. Ivy in 1993 as a limited partnership. She was the only employee and the business operated out of the basement of her Newton home.

Mt. Ivy signed separate (but nearly identical) publishing agreements with Lee and Defonseca in August of 1995. The parties also made provisions for a French edition for distribution in Europe, where advance publicity had stirred interest among book dealers.

[8]An American edition was published in 1997. Book endorsements were received from several quarters, including the New England chapter of the Anti-Defamation League. Soon thereafter, a French edition, Survivre avec les Loups (Survival with Wolves), was published by a Parisian publishing house, with Defonseca's oversight; other foreign editions followed. Unlike the American edition, the French edition had no photographs of Defonseca and identified her as "Monique Valle" (not De Wael).

[9]Lee named as "reach and apply defendants" Mt. Ivy's literary agent, Palmer & Dodge, LLP, and Publishers Group West, Inc., a West Coast firm that allegedly did business in the Commonwealth; the reach and apply defendants are not implicated in this appeal.

[10]The other claims were interference with contractual relations, fraud, quantum meruit, unjust enrichment, conversion, and intentional infliction of emotional distress.

Mt. Ivy) had wrongfully denied them certain royalties and other payments in breach of their respective agreements. Daniel and Mt. Ivy counterclaimed, alleging breach of contract, defamation, and trade disparagement. After a three-week trial, a jury awarded $7.5 million to Defonseca and $3.3 million to Lee.

Reserving the c. 93A portion of the case to herself for decision, the judge found that Daniel and Mt. Ivy had wilfully and knowingly engaged in conduct designed to deprive Defonseca and Lee of royalties and other compensation. In a detailed decision, and drawing from a comprehensive set of findings linked to the evidence at trial, the judge concluded that Daniel and Mt. Ivy had engaged in unfair and deceptive business practices in violation of c. 93A. The judge trebled the jury's award and assessed attorney's fees and costs.

Daniel and Mt. Ivy appealed from the judgment to this court. After oral argument, but before our decision in that appeal issued, some of the parties settled their claims. In exchange for some sum (unspecified in the record before us), Defonseca relinquished any claim to the judgment in her favor, unless Daniel or Mt. Ivy pursued any claim against her. In a separate agreement, Lee released Daniel, but not Mt. Ivy, in exchange for an assignment of $250,000 from a settlement between Daniel and her counsel and an assignment of the proceeds from the future sale of Daniel's house, subject to certain adjustments.[11],[12]

Also while the first appeal was pending, Daniel came to learn of information she believed cast doubt on aspects of Defonseca's memoir. Specifically, a bank record that had been produced posttrial showed Defonseca's birth date, birth place, and mother's maiden name, all of which she claimed in her book to have no knowledge of. With this newly discovered material, Daniel tried to access vital family records in Belgium, only to be frustrated by that country's privacy laws. Search was made of ships' passenger lists in our local archives, the Yad Vashem database of

[11]There is nothing to suggest that the instant appeal or the underlying case is moot as a result of the settlements, and no party so contends.

[12]The terms of the settlement agreements are not part of our (or the motion judge's) consideration for purposes of the motion to dismiss. However, the terms of those agreements may factor into the analysis as the case proceeds after remand. What effect, if any, they might have going forward will benefit from further factual development below.

the names of more than 3 million Holocaust victims, and various genealogical Internet Web sites. Not until a forensic genealogist, Sharon Sergeant, became involved did the search for Defonseca's background yield critical information. Sergeant, having noticed the many Catholic references in the French and United Kingdom editions of Defonseca's memoir, undertook a search of Catholic baptismal records in Belgium, and discovered there was a maternity ward in a hospital in Etterbeek, the district of Brussels that had been identified on Defonseca's bank record.

Ultimately, Defonseca's true identity was uncovered. Piece by piece, with aid from Sergeant, Daniel was able to learn that Defonseca had been born Monica Ernestine Josephine De Wael on May 12, 1937, in Etterbeek, Belgium. Her family's residence was in the Schaerbeek district of Brussels, and she was registered as a student in an elementary school located there for the fall term of 1943 — the very same time period that she claimed to be in the midst of a journey across Nazi-controlled Europe. With this new information about Defonseca, especially her original surname "De Wael," the Belgian press reported more proof of Defonseca's fraud,[13] which completely unraveled in or about late 2007 or the early part of 2008.[14]

b. *Current proceedings.* In April, 2008, Daniel and Mt. Ivy commenced an independent action, pursuant to rule 60(b), in the Superior Court against Defonseca and Lee, seeking to set aside the $33 million judgment. In relevant part, the complaint asserted two counts against Defonseca (a claim under rule 60[b] for fraud on the court and a claim under rule 60[b][6]) and two parallel counts against Lee. The complaint alleged that the judgment was the product of a deliberate and cleverly concealed fraud, purposefully carried out by Defonseca with the aid of her counsel.[15] Daniel and Mt. Ivy alleged that perjured testimony,

---

[13]Notably, in March of 2008, Le Soir, a prominent newspaper in Belgium, published a report disclosing that Defonseca's father had collaborated with the Gestapo, providing information about members of the Belgium resistance movement.

[14]Daniel's search was successful largely because of technological advances, including the Internet, which allowed her to correspond with others on a world-wide scale not previously possible or practicable.

[15]Daniel and Mt. Ivy no longer rely on action by Defonseca's attorneys to support their claims.

false court pleadings and discovery responses, as well as fraudulent exhibits, all had a hand in misleading the jury and the court. Among other things, they pointed to the fact that Defonseca's trial counsel stressed in closing argument that the authenticity of Defonseca's book was not disputed:

> "And what was [Defonseca] trying to defend herself about? Her life story. The tragedy has already been visited on Misha, that's not in dispute. She lost her parents at 7 years old, and wandered through Europe unprotected for four years. That's not in dispute. That happened to her."

The complaint contained no allegations suggesting that Lee had any knowledge of the fraud, or that she had any reason to know that Defonseca's story was not true.

The defendants moved to dismiss the complaint under rule 12(b)(6). Notably, Defonseca did not dispute Daniel's allegations of fraud, or the related media reports discrediting Defonseca's book and trial testimony. Nor did Defonseca dispute a February 28, 2008, Boston Globe article that reported Defonseca candidly "acknowledged" that "every essential element of her autobiography [was] false, that her trial testimony was perjured and that every document she filed with the [Superior] Court when acting as her own counsel, was intended to mislead the Court and the jury."[16]

The judge allowed the motion to dismiss. As to the rule 60(b)(6) claim, the judge concluded that the allegations of the complaint fell within the parameters of rule 60(b)(3), which applies in cases of fraud, and that the complaint alleged no "extraordinary circumstances" that might warrant relief under rule 60(b)(6). See *Paternity of Cheryl,* 434 Mass. 23, 34-35 (2001); *Owens* v. *Mukendi,* 448 Mass. 66, 71 (2006). As a result, the judge concluded that the plaintiffs' action was barred by the one-year limitations period of rule 60(b)(3). See *Winthrop Corp.* v. *Lowenthal,* 29 Mass. App. Ct. 180, 182-183 (1990). With respect to the plaintiffs' claim of fraud on the court, the judge concluded that the allegations, as a matter of law, did not make out such a claim.

---

[16]Nor has Defonseca offered anything to counter her statement to the foreign press (republished in the local newspapers) confessing to the fraud.

Daniel and Mt. Ivy have timely appealed from the judgment of dismissal.

*Discussion.* "Rule 60 sets forth a comprehensive framework for obtaining relief from a final judgment or order, balancing the competing needs for finality and flexibility to be certain that justice is done in light of all the facts." *Sahin* v. *Sahin*, 435 Mass. 396, 399-400 (2001). Rule 60(b) has two parts. The first part sets out six numbered circumstances under which a party may move for relief from a judgment. The second part (an unnumbered provision) permits a party to seek relief by way of an independent action. Here, the plaintiffs seek relief by way of an independent action. We discuss the plaintiffs' claims as they apply to each defendant.

a. *Defonseca.* i. *Rule 60(b)(6).* In relevant part, rule 60(b) provides:

> "On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment . . . for the following reasons: . . . (3) fraud . . . , misrepresentation, or other misconduct of an adverse party; . . . or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment . . . was entered . . . . This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment . . . or to set aside a judgment for fraud upon the court . . . and the procedure for obtaining any relief from a judgment shall be by motion . . . or by an independent action."

Relief under 60(b)(6) is available only when justified "by some reason other than those stated in subdivisions (1) through (5)." *Chavoor* v. *Lewis*, 383 Mass. 801, 806 (1981). When examining whether 60(b)(6) relief is warranted, we consider "whether the moving party has a meritorious claim or defense . . . whether extraordinary circumstances warrant relief . . . and whether the substantial rights of the parties in the matter in controversy will be affected by granting the motion." *Owens*, 448 Mass. at 72 (citations and internal quotation marks omitted).

Unlike motions pursuant to rule 60(b)(1) through (b)(3), which

must be brought within a reasonable time, but no later than one year after judgment, *id.* at 73 n.9, and motions pursuant to rule 60(b)(6), which must be brought within a reasonable time after judgment, *Kennedy* v. *Beth Israel Deaconess Med. Center, Inc.*, 73 Mass. App. Ct. 459, 467 (2009),[17] there is no specified time limit for bringing an independent action for relief from judgment.[18] *Sahin*, 435 Mass. at 400-401. "That said, however, 'a party should not be able to avoid the one-year or "reasonable time" limits of Rule 60(b) simply by commencing an independent action seeking the same relief.' " *Id.* at 401, quoting from Smith & Zobel, Rules Practice § 60.16, at 488 (1977 & supp. 2001). "Many of the principles covering fraud, fraud upon the court, void judgments, mistake, or even newly-discovered evidence, control an independent action seeking the same kind of relief." Smith & Zobel, Rules Practice § 60.16, at 395 (2007) (footnotes omitted). "To the extent that the claims raised by a party's independent action appear to fall within those provisions of rule 60(b) that mandate a specific time limitation, but materialized too late to file in a motion to the court which rendered the judgment, the party must raise some additional ground or reason justifying relief after the expiration of the time limitation." *Sahin, supra* at 401. The party seeking relief must show that allowing the judgment to stand would be "manifestly unconscionable," *id.* at 402, quoting from *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.*, 322 U.S. 238, 244-245 (1944) (independent action

---

[17]A reasonable time may be more or less than one year. *Kennedy, supra.*

[18]Although rule 60(b) states that relief may be sought by way of a motion, it also states that relief may be invoked in an independent action. Had the plaintiffs sought rule 60(b)(6) relief by way of a motion filed in the original underlying action, we would review for abuse of discretion. *Gath* v. *M/A-Com, Inc.*, 440 Mass. 482, 497 (2003). However, we review de novo a rule 12(b)(6) dismissal of a rule 60 claim that is raised in an independent action. See *Sahin, supra* at 399-407 (sub silentio applying de novo review in procedural posture identical to the present case). Accord *Herring* v. *United States*, 424 F.3d 384, 389-390 (3rd Cir. 2005) (review of district court grant of Fed. R. Civ. P. 12[b][6] motion to dismiss independent rule 60 action is subject to de novo review). In other words, we employ the standard of review for appeals from the allowance of a rule 12(b)(6) motion. See *Iannacchino* v. *Ford Motor Co.*, 451 Mass. 623, 635-636 (2008). "We review the allowance of a motion to dismiss to determine whether facts alleged in the complaint raise a right to relief above the speculative level, on the assumption that all the allegations of the complaint are true." *Largo Realty, Inc.* v. *Purcell*, 77 Mass. App. Ct. 162, 163 (2010).

proper "to prevent unconscionable retention or enforcement of a judgment"), or a "grave miscarriage of justice." *Sahin, supra* at 402, citing *United States* v. *Beggerly*, 524 U.S. 38, 46-47 (1998). We consider this standard to have been met here, at least for purposes of surviving a motion to dismiss.

The plaintiffs have alleged an extraordinary fraud that touched every part of Defonseca's case against them and resulted in a huge verdict. It is true, as the defendants point out, that the book's authenticity was not the central issue at trial. Despite this, it is difficult to imagine that this information, had it been known to Daniel and Mt. Ivy, would not have provided a meritorious defense to at least some of the claims, especially those claims based on the contract.[19] See, e.g., *Quintin Vespa Co.* v. *Construction Serv. Co.*, 343 Mass. 547, 554 (1962) (material breach excuses other party from further performance). It is equally implausible to suggest that the information, if it had been presented to the jury, would not have affected the "substantial rights of the parties." *Owens*, 448 Mass. at 72, quoting from *Parrell* v. *Keenan*, 389 Mass. 809, 815 (1983).

The size of the award is also a circumstance to be considered. Defonseca obtained a judgment that, once trebled, exceeded $20 million. Much of that amount consisted of multiple damages under c. 93A. Multiple damages are awarded only for wilful, culpable conduct, that results in a "grievous violation of societal interests." *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 856 n.21 (1983) (citation omitted). See *Kapp* v. *Arbella Mut. Ins. Co.*, 426 Mass. 683, 686 (1998). The jury and judge, of course, were unaware that the book was a hoax, rather than a heart-rending story of Holocaust survival.

We also consider Defonseca's conduct as a pro se litigant. Although it is true that perjury, standing alone, generally does not support relief under rule 60(b)(6), Defonseca's alleged conduct goes well beyond that. Defonseca's entire case, and the manner in which she procured the judgment, was buttressed on what is now admitted to be a lie. The pleadings she filed were false and based on false information. The affidavits she submitted were premised on her phony life story. Her testimony at

---

[19]The contract with Defonseca contained a warranty in which she represented that "all statements of fact are true or based on reasonable belief."

trial reiterated, and reinforced, her sympathetic but ultimately false tale.

We are satisfied that the allegations of the complaint, considered under the appropriate standard, are sufficient to state an independent action based on rule 60(b)(6).

ii. *Fraud on the court.* Rule 60(b) permits "an independent action . . . to set aside a judgment for fraud upon the court." In our jurisprudence, "fraud on the Court" is a term of art with a stringent definition. *Matter of the Trusts Under the Will of Crabtree,* 449 Mass. 128, 148 (2007). "A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Rockdale Mgmt. Co.* v. *Shawmut Bank, N.A.,* 418 Mass. 596, 598 (1994), quoting from *Aoude* v. *Mobil Oil Corp.,* 892 F.2d 1115, 1118 (1st Cir. 1989). "Examples of 'fraud on the Court' include 'bribery of judges, employment of counsel to "influence" the court, [and] involvement of an attorney (an officer of the court) in the perpetration of fraud.' " *Will of Crabtree, supra* at 149, quoting from *MacDonald* v. *MacDonald,* 407 Mass. 196, 202 (1990). "A party's nondisclosure to an adverse party . . . or to the court . . . of facts pertinent to a controversy before the court, without more, does not amount to 'fraud on the court' for purposes of vacating a judgment under rule 60(b)." *Paternity of Cheryl,* 434 Mass. at 36. "The doctrine embraces 'only that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.' " *Id.* at 35-36, quoting from *Pina* v. *McGill Dev. Corp.,* 388 Mass. 159, 165 (1983).

There are some falsehoods that are so emotionally inflammatory that they impede the jury's ability impartially to evaluate facts and adjudicate a case. Falsely claiming to be a victim (and survivor) of the Holocaust is such a one, particularly where — as here — the claim is the foundation of a book the publication, distribution, and marketing of which were the subjects of the

suit. Defonseca perpetrated this falsehood, and it lay at the center of the case.

As noted above, Defonseca proceeded in part pro se, and she now argues that only an officer of the court can commit fraud on the court. Although fraud on the court typically involves officers of the court, we are unprepared to say that pro se litigants are in all circumstances insulated from committing fraud on the court. Pro se litigants are generally required to comply with the same rules as represented parties and their attorneys, see, e.g., *Pandey* v. *Roulston*, 419 Mass. 1010, 1011 (1995); *Kyler* v. *Everson*, 442 F.3d 1251, 1253-1254 (10th Cir. 2006), and there is no reason to immunize them from the consequences of the most egregious forms of misconduct. Cf. *Pumphrey* v. *K.W. Thompson Tool Co.*, 62 F.3d 1128, 1130-1131 (9th Cir. 1995) (attorney's involvement in the discovery process, which included the holding and withholding of key information, was "sufficient to render him an officer of the court" for purposes of the fraud on the court doctrine even though he did not represent party); *Herring* v. *United States*, 424 F.3d 384, 390-391 (3d Cir. 2005) (attorneys who did not represent United States, but asserted claim of privilege on behalf of United States, were "officers of the court" for fraud on the court purposes).

We are satisfied that, accepting the allegations of the complaint as true and viewing Defonseca's misconduct as a whole, which included not just one or two instances of false testimony, but an entire case buttressed by falsehoods, the plaintiffs have sufficiently stated a claim of fraud on the court.

b. *Lee.* The plaintiffs' case against Lee stands in a much different posture. The complaint does not allege that Lee knew, or had reason to know that Defonseca's memoir was fraudulent. The complaint's silence in this regard is consistent with the trial judge's conclusion that the allegations indicated Lee alerted Daniels to the fact that the book had not been fact-checked and that many historical facts needed to be verified. Moreover, the allegations indicate that Lee was removed from the project before its completion. There is also no allegation that Lee made any false statements in the course of the litigation, whether during discovery or trial. Instead, the plaintiffs allege Lee "rode the coattails of Defonseca's fraudulent conduct" and that

Defonseca's misconduct tainted the entire proceeding. Conceding at oral argument that they have not stated a claim of fraud on the court against Lee, the plaintiffs nonetheless continue to argue that they have stated a claim under rule 60(b)(6) against her. We disagree. The plaintiffs have not cited any authority, nor have we found any, for the proposition that a party may be stripped of a judgment where she herself is not alleged to have done anything wrong. Rule 60(b)(6) strikes a balance between "the competing needs for finality and flexibility to be certain that justice is done in light of all the facts." *Sahin*, 435 Mass. at 399-400. Although Lee may have benefited from the sympathy of Defonseca's supposed life story, this alone does not tip the scale in favor of abandoning our institutional interest in finality. The plaintiffs have not alleged that Lee has committed *any* fraud or misconduct, let alone the kind of extraordinary fraud that could justify setting aside an eight year old judgment under rule 60(b)(6).

*Conclusion.* Because the plaintiffs have not stated a claim for rule 60(b)(6) relief against Lee, and because they conceded at oral argument they are not pursuing a fraud on the court claim against Lee, that portion of the judgment which dismisses the plaintiffs' claims against Lee is affirmed. However, for the reasons set out above, we reverse that portion of the judgment which dismisses the plaintiffs' claims against Defonseca.

*So ordered.*