508

### *ORDER*

38 A.3d 798

**K.E.M., Appellant**

v.

**P.C.S., Appellee.**

Supreme Court of Pennsylvania.

Submitted Sept. 2, 2011.

Decided Feb. 21, 2012.

510

Jeffrey Charles Marshall, York County Domestic Relations Office, York, for K.E.M.

Kathleen Jo Prendergast, for P.C.S.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice SAYLOR.

In this appeal arising in the child support setting, we consider the application of paternity by estoppel.

Appellant, the mother of G.L.M., filed a complaint seeking support from Appellee, whom she believes to be G.L.M.'s biological father. Appellee responded with a motion to dismiss, relying upon Mother's intact marriage to H.M.M. at the time of G.L.M.'s birth as establishing a presumption of paternity, *see Brinkley v. King*, 549 Pa. 241, 248–50, 701 A.2d 176, 179–80 (1997) (plurality) (explaining that, "generally, a child

conceived or born during the marriage is presumed to be the child of the marriage"), and on H.M.M.'s assumption of parental responsibilities as implicating paternity by estoppel, *see Fish v. Behers*, 559 Pa. 523, 528, 741 A.2d 721, 723 (1999) ("A party may be estopped from denying the husband's paternity of a child born during a marriage if either the husband or the wife holds the child out to be the child of the marriage."). *See generally Brinkley*, 549 Pa. at 249, 701 A.2d at 180 ("The presumption of paternity and the doctrine of estoppel ... embody the two great fictions of the law of paternity: the presumption of paternity embodies the fiction that regardless of biology, the married people to whom the child was born are the parents; and the doctrine of estoppel embodies the fiction that, regardless of biology, in the absence of a marriage, the person who has cared for the child is the parent.").

The common pleas court conducted a hearing on the motion. Appellee offered evidence that, although H.M.M. is not identified as the father on G.L.M.'s birth certificate, baptismal records so indicate. *See* N.T., Aug. 5, 2010, at 6–7. Furthermore, Appellee's counsel adduced brief testimony from Appellant to the effect that, while she and H.M.M. were separated as of the time of the hearing, neither had commenced divorce proceedings; their last tax returns were filed jointly, with G.L.M. claimed as a dependent; and both contributed to G.L.M.'s upbringing. *See id.* at 9–10.

On her own attorney's examination, Appellant testified that she married H.M.M. in 1997, and the couple had two daughters. *See id.* at 11. Appellant discussed her intimate, extramarital affair with Appellee during her marriage and at the point in time at which G.L.M. was conceived. *See id.* at 12–14. Appellant stated that she eventually advised H.M.M. of her conduct, and H.M.M. did not wish to be identified as the father on the birth certificate. *See id.* at 15, 19–20. According to Appellant's evidence, genetic testing was performed, which excluded H.M.M. as the biological father. *See id.* at 16–17 & Ex. R–1. After she received the results, Appellant testified, she also asked Appellee to submit to testing, but he refused, although he acknowledged G.L.M. as his son. *See id.*

at 18, 29. Appellant explained that, throughout the four years of G.L.M.'s life, Appellee had periodically undertaken some degree of involvement in his life, giving Appellant money to buy Christmas presents; providing unsigned cards and some gifts of his own; visiting parks and playgrounds; and supplying a cell phone to assure Appellant's and G.L.M.'s safety. *See id.* at 20–24, 28. She also testified that G.L.M. referred to both H.M.M. and Appellee as "Daddy," although Appellee discouraged the latter from doing so. *See id.* at 30, 34. She and Appellee, Appellant related, discussed plans to establish a household together, but eventually Appellee ended the relationship. *See id.* at 25–27. In roughly the same time period, H.M.M. separated himself from Appellant. *See id.* at 9–10, 24.

On redirect examination, Appellee's attorney elicited additional testimony concerning H.M.M.'s pre-separation involvement in G.L.M.'s life, including his performance of a fatherly role and residence with the family until June of 2010. *See id.* at 33–34.

After taking the matter under advisement, the common pleas court granted Appellee's motion to dismiss the support action against Appellee, finding that the presumption of paternity was controlling and, alternatively, that H.M.M. should be regarded as G.L.M.'s father via paternity by estoppel. *See K.E.M. v. P.C.S.*, No. 01174SA2010, *slip op.* at 6, 9 (C.P.York, Aug. 25, 2010). As to the former theory, the court observed that the presumption of paternity is considered to be "one of the strongest presumptions within our law." *Brinkley,* 549 Pa. at 246, 701 A.2d at 179 (quoting *John M. v. Paula T.,* 524 Pa. 306, 322, 571 A.2d 1380, 1388 (1990) (Nix, C.J., concurring)). The court elaborated that, under the presumption, a party who denies paternity of a child born during an intact marriage has the burden to show by clear and convincing evidence that the presumptive father lacked access to the mother or was incapable of procreation. *See id.* at 248, 701 A.2d at 179. Additionally, the court explained that the policy rationale supporting the presumption is the concern that intact marriages should not be undermined by disputes over parentage. *See id.* at 249, 701 A.2d at 180.

The common pleas court recognized that such policy justification does not pertain where there is no intact marriage. *See K.E.M.*, No. 01174SA2010, *slip op.* at 4–5 ("Where the family unit no longer exists, it defies both logic and fairness to apply equitable principles to perpetuate a pretense.") (citing, *inter alia, Doran v. Doran*, 820 A.2d 1279, 1283 (Pa.Super.2003)). Nevertheless, the court highlighted, this determination is one of fact, *see Vargo v. Schwartz*, 940 A.2d 459, 467 (Pa.Super.2007), and, in the circumstances, it considered Appellant's and H.M.M.'s marriage to be an intact one. Its rationale, in this respect, was as follows:

> Over the course of the extensive testimony by [Appellant], we observed that she possesses a great deal of indecision regarding her marriage. We are not convinced that the marriage between [Appellant] and [H.M.M.] is irretrievably broken. We believe reconciliation is possible, particularly in light of the fact there is no divorce proceeding pending. Because the couple is merely separated, the family remains somewhat intact and equitable principles are applicable. While still applicable, the presumption of paternity has been destroyed in the minds of the parties by the knowledge of the true biological father. There is no dispute that [H.M.M.] did not father the child. [Appellant] testified at hearing that during the pregnancy, she suspected the child was not her husband's, as she was intimate with [Appellee] around the time of conception. Subsequently, she had a DNA test done. The DNA test showed unequivocally, that husband was not the child's father. While presumption of paternity is applicable, we also determine that [Appellant] is equitably estopped from pursuing support/paternity against [Appellee], the biological father.

*K.E.M.*, No. 01174SA2010, *slip op.* at 5–6.

As to paternity by estoppel, the common pleas court explained that the doctrine embodies a legal determination that one may be deemed a parent based on his holding himself out as such. *See Jones v. Trojak*, 535 Pa. 95, 105, 634 A.2d 201, 206 (1993) (indicating that "the law will not permit a person in these situations to challenge the status which he or she has

previously accepted"); *see also Fish*, 559 Pa. at 530, 741 A.2d at 724 (stating that "children should be secure in knowing who their parents are[;] if a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father." (quoting *Brinkley*, 549 Pa. at 249–50, 701 A.2d at 180)). The court also sought to give effect to the decisions of this Court setting up the presumption of paternity and paternity by estoppel as thresholds to a court directive for genetic testing. *See Jones*, 535 Pa. at 104–05, 634 A.2d at 206 ("We adopt the approach taken by the Superior Court in *Christianson v. Ely*, [390 Pa.Super. 398, 568 A.2d 961 (1990) ] which mandates that before an order for a blood test is appropriate to determine paternity the actual relationship of the presumptive father and natural mother must be determined."); *id.* at 105, 634 A.2d at 206 ("These estoppel cases indicate that where the principle is operative, blood tests may well be irrelevant[.]").[1]

Based on the hearing record, the common pleas court determined that H.M.M. had held himself out as G.L.M.'s father. It continued:

Even after learning that he was not the biological father, [H.M.M.] continued to provide emotional and financial support for the child as well as perform all familial duties as a father would. [H.M.M.] also claimed the child as a dependent every year for tax purposes and was presented at the child's baptism as the child's father. Although the two older daughters from the marriage were well aware that he had not fathered the child, [H.M.M.] declared the child to be his own to the general public.

*K.E.M.*, No. 01174SA2010, *slip op.* at 9.

Appellant filed a notice of appeal, and the Superior Court affirmed in a divided, memorandum opinion. Initially, the

1. Thus, in certain paternity-related matters, these decisions marginalized the application of the statutory scheme for genetic testing reposited in the Uniform Act on Blood Tests to Determine Paternity, Act of Dec. 19, 1990, P.L. 1240, No. 206 § 2 (codified at 23 Pa.C.S. § 5104).

majority differed with the common pleas court's conclusion that the presumption of paternity applied, reasoning that it is inapplicable in circumstances in which it would not protect a marriage "from the effects of disputed paternity." *K.E.M. v. P.C.S.*, No. 1566 MDA 2010, *slip op.* at 5 (Pa.Super. Apr. 21, 2011) (quoting *B.S. v. T.M.*, 782 A.2d 1031, 1036 (Pa.Super.2001) (determining that the presumption did not apply where a married couple had reconciled "with full knowledge of all the facts")); *accord Lynn v. Powell,* 809 A.2d 927, 930 (Pa.Super.2002) (holding that the presumption did not apply where the husband knew the child had been conceived as a result of his wife's extramarital affair but remained married to her). Based on these decisions, the majority concluded that "the presumption is not applicable because it would not serve to protect the marriage where [H.M.M.] has full knowledge that he is not the child's biological father. Therefore, should the marriage survive, it will do so in spite of the parentage issue." *K.E.M.*, No. 1566 MDA 2010, *slip op.* at 6 (footnote omitted). The majority, however, deemed the error it found in the common pleas court's application of the presumption of paternity to be harmless, since it agreed with that court that paternity by estoppel applied. Quoting from *Lynn*, the majority explained:

We do not allow a person to deny "parentage" of a child, regardless of biological status, if that person holds the child out as his own and provides support. When such circumstances exist, we will also not allow a child's mother to sue a third party for support based on biological status. Plainly, the law does not allow a person to challenge his role as a parent once he has accepted it, even with contrary DNA and blood tests.

*Id.* at 7 (quoting *Lynn*, 809 A.2d at 929–30 (citations omitted)). In barring Appellant from pursuing support against Appellee, the Superior Court majority relied on the factual circumstances reflected above.

President Judge Emeritus McEwen dissented, taking the position that the matter was controlled by *Vargo*, 940 A.2d at 470–71 (upholding a trial court determination that paternity by

estoppel did not apply). The dissent also echoed the sentiments of the *Vargo* panel, as reflected in the majority opinion authored by Judge (now-Justice) McCaffery, to the effect that the common law legal fictions being applied in this sensitive area of the law should be modified to allow for fully informed judicial decision making grounded in the best interests of the child. *See K.E.M.*, No. 1566 MDA 2010, *slip op.* at 1–2 (McEwen, P.J.E., dissenting) ("A caring and just society should not be seen to condone or even permit the fathering of a child without the presumptive responsibility to contribute to the care of that child, and where the application of the doctrine of paternity by estoppel interferes with that responsibility, it would wisely be abrogated."); *cf. Vargo*, 940 A.2d at 467–68 n. 6 ("The difficulty in determining the status of the Vargo marriage—and the enormous ramifications of that factual determination for the parties as well as for the young children involved in this case—prompt us to add our voice to earlier calls for modification of Pennsylvania law to permit DNA testing as an alternative avenue for rebutting the presumption of paternity.") (citing, *inter alia, Brinkley*, 549 Pa. at 258–67, 701 A.2d at 185–89 (Newman, J., dissenting)).

We allowed appeal to consider the application of the doctrine of paternity by estoppel in this case, and, more broadly, its continuing application as a common law principle. In terms of the narrower (former) question, our review focuses on whether the common pleas court abused its discretion. *See Maher v. Maher*, 575 Pa. 181, 184, 835 A.2d 1281, 1283 (2003) (quoting *Humphreys v. DeRoss*, 567 Pa. 614, 617, 790 A.2d 281, 283 (2002)). The broader (latter) question is one of law, as to which our review is plenary.

Appellant argues that paternity by estoppel should not have been applied to defeat her child support claim, because G.L.M. already knows Appellee as his father and, therefore, there is no concern over deleterious impact from a judicial determination to such effect. *Accord Wieland v. Wieland*, 948 A.2d 863, 870 (Pa.Super.2008) ("Because evidence has proven that [a man] is [a child's] biological father, but, most important, because [the child] has been informed of this fact, this Court

must bear in mind that the best interests of the child is the overriding policy."). Appellant directly questions the application of a legal fiction in a circumstance in which all parties involved fully apprehend the true state of affairs, a circumstance which is becoming increasingly common. *See* Brief for Appellant at 27 ("Mothers and putative fathers in today's society are free to conduct genetic testing outside of any judicial proceeding and are doing so based on increased availability and decrease in cost.").

It is also her position that Appellee acted as G.L.M.'s parent based upon the evidence of periodic visits, gifts, and cards. Furthermore, Appellant asserts, Appellee does not have clean hands, since he encouraged and participated in the relationship as the father of G.L.M. and Appellant's paramour. In this regard, she references *Kohler v. Bleem*, 439 Pa.Super. 385, 399–400, 654 A.2d 569, 577 (1995) (holding that a biological father was "precluded from utilizing equitable principles," *inter alia*, in light of his participation in a subterfuge). Appellant distinguishes *Fish*, in which paternity by estoppel applied to the advantage of a biological father defending against a support claim, *see Fish*, 559 Pa. at 529–30, 741 A.2d at 723–24, on the basis that she felt she had no choice in continuing to reside with her husband. Brief for Appellant at 17 (stating that "[Appellee] refused to commit to a relationship with [Appellant] and the child and she had no means of supporting herself and the child, independently"). According to Appellant, application of paternity by estoppel in the present case would result in the child being left fatherless and no father being responsible for the support of the child.[2]

Further, Appellant specifically asks that Pennsylvania law be modified to consider genetic testing, along with other factors, in determining paternity on a case-by-case basis. She explains that an inflexible rule perpetuating a non-factual portrayal of paternity will not always best serve the best interests of children. *See, e.g., id.* at 10 ("In today's society,

2. Appellant's argument, in this respect, does not account for the possibility of her asserting paternity by estoppel in a support action against H.M.M.

there is no assurance that past conduct as a parental figure to a child will continue into the future based upon a judicial finding that is know[n] to be a fiction by the parties and eventually the child."). Additionally, Appellant expresses concern that a husband should not be punished for acting responsibly in relation to his wife's children, *see id.* at 16 (citing *Vargo,* 940 A.2d at 470) ("We do not read our law to require acts that place children at risk or in need of life's basic necessities in order to reinforce the legal point that one is not financially responsible for those children."), and contends that estoppel should not serve as a shield for biological fathers to insulate themselves from the responsibility to support their children, financially at the very least, *see id.* at 18 (citing *Fish,* 559 Pa. at 531, 741 A.2d at 725 (Nigro, J., dissenting)); *accord DiPaolo v. Cugini,* 811 A.2d 1053, 1057 (Pa.Super.2002) (Hudock, J., dissenting). According to Appellant, placing the responsibility for financial support upon biological fathers would provide a consistent, readily identifiable source of sustenance, regardless of the relationship a child may enjoy with others.

Appellant also observes that important medical information accompanies knowledge of one's biological origins. More generally, she urges that legal theories which have arisen in very different temporal and social contexts should not perpetually impede the law's adaptation to modern conditions, relying on the able expressions of former Justices Nigro and Newman to the effect that the Court should move to the more flexible, case specific approach to paternity issues. *See* Brief for Appellant at 22–24 (citing *Fish,* 559 Pa. at 530–32, 741 A.2d at 724–25) (Nigro, J., and Newman, J., dissenting separately), *Strauser v. Stahr,* 556 Pa. 83, 93–97, 726 A.2d 1052, 1056–58 (1999) (Nigro, J., and Newman, J., dissenting separately), and *Brinkley,* 549 Pa. at 252–69, 701 A.2d at 182–90 (Nigro, J., and Newman, J., dissenting separately). Appellant concludes with the expression that this Court should, at a minimum, modify paternity by estoppel to permit the admission and consideration of genetic testing in disputed paternity proceedings, along with other relevant factors. She also suggests that any

finding of paternity for purposes of support should be limited to such context and should not impact one's ability to seek custody or visitation. *Cf. Wieland,* 948 A.2d at 870.

Appellee, on the other hand, focuses on H.M.M.'s continued participation in the marriage and fatherly relationship with G.L.M. for the first four years of his life. He regards his own involvement as insignificant, both standing on its own and, particularly, by way of comparison to H.M.M.'s. *See, e.g.,* Brief for Appellee at 10–11 ("While [Appellant] seems to wish for greater contact than there was, the truth is that teenage babysitters typically discharge more parental duties than [Appellee] did over the course of the last four years relative to this child.").

In discussing policy concerns, Appellee touches on the historical perspective, in which courts maintained substantial concern over the stigma associated with legitimacy; there was a prevailing desire to counterbalance the possibilities for legal and social discrimination; and reliable genetic testing was unavailable. *See id.* at 12 ("The advent of paternity testing challenged the underpinnings of paternity law, which maintained a strong presumption in favor of a mother's husband."). *See generally John M.,* 524 Pa. at 312 n. 2, 571 A.2d at 1383 n. 2 (offering a historical perspective). Appellee points to a "flurry of paternity cases in Pennsylvania in the late 1900s and early 2000s," in which the courts attempted to reconcile long-established precedents in the face of scientific and social changes. Brief for Appellee at 12. In this regard, he relates that "[r]easonable minds have disagreed as to the weight that should be given to precedent in the face of this changing technology, resulting in frequent dissenting opinions urging more reliance on paternity testing." *Id.* at 12–13. He also acknowledges legislative forays into the arena, such as the Uniform Act On Blood Tests To Determine Paternity, *see supra* note 1, but couches these statutes as "sparse and outdated." Brief for Appellee at 12 (explaining that, "[w]hile early cases such as *Brinkley* and the relevant statute refer to paternity testing as a 'blood test,' the tests are now usually given as a mouth swab test and are essentially painless." (citation omitted)).

Appellee believes the present approach to paternity by estoppel, as exemplified by *Brinkley* and *Fish*, remains appropriate, because it recognizes the importance, in a child's life, of a "psychological father" who has provided nurturing and life's necessities. *Id.* at 21. He also suggests that the estoppel doctrine establishes a salutary incentive that, if genetic testing is to occur, it should occur early in a child's life in circumstances in which paternity may be unclear. While recognizing the best interests of the child as the "overriding principle" in the support arena, Appellee believes the estoppel principle is best suited to advance such interests. *See id.* at 10; *see also id.* at 22 (arguing that "paternity by estoppel should survive because it is in the best interests of children to hold adults accountable when, through their action or inaction, they allow or encourage them to bond with a psychological father"). Along these lines, Appellee quotes this Court's observation from *Fish* relative to the husband and child involved in the case:

> The father-son relationship with appellant's husband is the only such relationship this child has known. The alternative—forcing the child into a relationship with appellee, a man whom he does not know—is not in the best interests of this child.

Brief for Appellee at 10 (quoting *Fish*, 559 Pa. at 529, 741 A.2d at 724).

Appellee observes a trend in the decisional law to narrow the concept of an "intact marriage" and, correspondingly, the application of the presumption of paternity. *See, e.g., Fish*, 559 Pa. at 528, 741 A.2d at 723 (explaining that the presumption of paternity no longer applies in the context of non-intact marriages). He explains that the weakening of the presumption has the effect of heightening the importance of the paternity by estoppel, which is the remaining vehicle by which a "psychological father" may be recognized as a legal parent in paternity matters.

Furthermore, Appellee advances a sort of an equal-protection overlay relative to the rights and interests of husbands and third-party biological fathers. *See, e.g.,* Brief for Appellee

at 16 ("The court should not block fathers from asserting their rights through the fiction of an 'intact marriage' while expanding the rights of mothers to assert rights against fathers any time they please by crumbling the underpinnings of paternity by estoppel."). Fundamentally, he believes the historical underpinnings of paternity by estoppel remain sound. *See, e.g., id.* at 18 ("[W]hen the parties allow or encourage a bond creating a psychological father, particularly in the mother's husband, by their actions or inactions, then all parties should be estopped from disturbing that bond."). Finally, Appellee offers a detailed proposal to overhaul the presumption of legitimacy and the doctrine of paternity by estoppel.[3]

■ At the outset, we clarify what is, and is not, before the Court. The allocatur grant order squarely concerns paternity

---

**3.** Specifically, Appellee posits:

The husband of the mother is presumed to be the father of the child. However, if there is some question of paternity, then the mother must inform at least her husband so that she is not engaging in fraud or misrepresentation if her husband is put on the birth certificate. Paternity testing should then be requested at the hospital at the time of the birth of the child. The technology has advanced to the point that those types of tests should become routine and timely. If the mother's husband makes an informed decision to be named as the father on the birth certificate, then he has, in essence, adopted the child as his own regardless of DNA, and that decision cannot be disturbed by any putative fathers outside the marriage. An informed decision to list the husband as the father on the birth certificate gives the couple a definitive way to promote the rationale currently supported by the current "intact marriage" doctrine while discouraging mothers from engaging in fraud. If however, the husband chooses not to be listed as the father on the birth certificate, then mother and her husband should have a limited period of time, perhaps a year from the birth of the child, to initiate any action against a third party putative father. Similarly, a putative father would have the same period of time from when he knew or should have known that he was a putative father in order to assert his rights in any case where the mother's husband is not listed as the father on the child's birth certificate. If no party takes legal action in the specified time frame, then, in essence, a de facto adoption has occurred by Mother's husband, and paternity by estoppel applies.

Brief for Appellee at 18–19; *id.* at 22 ("[P]aternity by estoppel should survive because it is in the best interests of children to hold adults accountable when, through their actions or inaction, they allow or encourage them to bond with a psychological father, regardless of biology.").

by estoppel, not the presumption of paternity. *See K.E.M. v. P.C.S.*, 611 Pa. 196, 23 A.3d 1050 (2011) (*per curiam*). While it would be ideal if a comprehensive scheme for paternity determinations and attendant support obligations were set out in one place, this simply is not the nature of common law judicial decision making.[4] As to the presumption of paternity, we note only that recent Pennsylvania decisions have relegat-,ed it to a substantially more limited role, by narrowing its application to situations in which the underlying policies will be advanced (centrally, where there is an intact marriage to be protected). *See Fish*, 559 Pa. at 528, 741 A.2d at 723. *See generally Godin v. Godin*, 168 Vt. 514, 725 A.2d 904, 909 (1998) ("Protecting innocent children from the social burdens of illegitimacy, ensuring their financial and emotional security, and ultimately preserving the stability of the family unit all contributed to the origins of the parental presumption, and all help to explain its enduring power today."). As Appellee also observes, this does increase the relative importance of paternity by estoppel in the support arena.

Second, the positions of Justices and judges favoring an enhanced role for genetic testing may have more limited

---

4. Our common-law decisions are grounded in records of individual cases and the advocacy by the parties shaped by those records. Unlike the legislative process, the adjudicatory process is structured to cast a narrow focus on matters framed by litigants before the Court in a highly directed fashion. The broader tools available to the legislative branch in making social policy judgments, including the availability of comprehensive investigations, are discussed in *Pegram v. Herdrich*, 530 U.S. 211, 221–22, 120 S.Ct. 2143, 2150, 147 L.Ed.2d 164 (2000). Certainly, the provision of guidance in this substantive area of the law is within the primary prerogative of the General Assembly, subject only to constitutional limitations. Notably, the Legislature, at least in the past, has actively considered the possibility for comprehensive treatment. *See generally* Jacinta M. Testa, *Finishing Off Forced Fatherhood: Does it Really Matter if Blood or DNA Evidence Can Rebut the Presumption of Paternity?*, 108 Penn. St. L.Rev. 1295, 1297 n. 11, 1311–13 & nn. 152–167 (2004) (collecting references to proposed legislation on the subject). It is also worth noting the various sources of model legislation which provide a platform for discussion, at the very least. *See, e.g.,* Nat'l Conference on Uniform State Laws, Uniform Parentage Act (2002); ALI, Principles of the Law of Family Dissolution: Analysis and Recommendations (2002).

relevance in the paternity by estoppel setting (as contrasted with the presumption of paternity). In the estoppel cases, a legal determination is being made that it is in the best interests of the child to continue to recognize the husband as the father. *Cf.* June Carbone & Naomi Cahn, *Marriage, Parentage, and Child Support*, 45 FAM. L.Q. 219, 229–30 (2011) ("[T]he estoppel cases more directly address the circumstances in which a functional parent may be treated as the legal father without a biological tie."). In this case for instance, at least the common pleas court certainly believed the evidence established that Appellee was G.L.M.'s biological father (without the necessity of a confirmatory genetic test), but it deemed the estoppel theory controlling nonetheless. *See K.E.M.*, No. 01174SA2010, *slip op.* at 6 (referring to Appellee as "the biological father").[5]

 Third, we believe there remains a role for paternity by estoppel in the Pennsylvania common law, in the absence of definitive legislative involvement.[6] We recognize the intransigent difficulties in this area of the law involving social, moral, and very personal interests. *See, e.g.*, David D. Meyer, *Parenthood in a Time of Transition: Tensions Between Legal, Biological, and Social Conceptions of Parenthood*, 54 AM. J. COMP. L. 125, 137 (2006) ("The law is clearly not of one mind when it comes to weighing the respective claims of blood, marriage, caregiving, and voluntary assumption of parental duty in defining the basis of parenthood."). Nevertheless, on the topic, subject to modest qualification, we join the senti-

5. This is not to say that a definitive, scientifically-based identification of the biological father is necessarily irrelevant. Presently, we merely note that much of the discussion in the dissenting expressions of Justices in past decisions was directed more to the presumption of paternity than to paternity by estoppel.

6. Notably, the American Law Institute's Principles of Family Dissolution endorses the application of paternity by estoppel to a person who has "lived with the child since the child's birth, holding out and accepting full and permanent responsibilities as parent, as part of a prior co-parenting arrangement with the child's legal parent ... to raise a child together each with full parental rights and responsibilities, when the court finds that recognition of the individual as a parent is in the child's best interests...." ALI, Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.03(1)(b)(iii) (2002).

ment expressed in an opinion authored by the late, Honorable William F. Cercone, as follows:

> Absent any overriding equities in favor of the putative father, such as fraud, the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child would be victimized. Relying upon the representation of the parental relationship, a child naturally and normally extends his love and affection to the putative parent. The representation of parentage inevitably obscures the identity and whereabouts of the natural father, so that the child will be denied the love, affection and support of the natural father. As time wears on, the fiction of parentage reduces the likelihood that the child will ever have the opportunity of knowing or receiving the love of his natural father. While the law cannot prohibit the putative father from informing the child of their true relationship, it can prohibit him from employing the sanctions of the law to avoid the obligations which their assumed relationship would otherwise impose.

*Commonwealth ex rel. Gonzalez v. Andreas*, 245 Pa.Super. 307, 312, 369 A.2d 416, 419 (1976).[7] The operative language of this passage centers on the best interests of the child, and we

---

7. In terms of the qualification, a typical fraud scenario (in which a husband is deluded into believing that a child is his own issue) is not before us, since H.M.M. was advised of the contrary possibility at or before G.L.M.'s birth. Thus, the strongest case for "overriding equities" is not present (albeit there may be some relevance to Appellant's and Appellee's continuance of the extramarital relationship into the ensuing years). We therefore reserve decision concerning the fraud scenario. In this respect, we note only that, even in such circumstances, there are arguments to be made that the best interests of a child should remain the predominate consideration, as reflected in the following perspective of a commentator:

> While some individuals are innocent victims of deceptive partners, adults are aware of the high incidence of infidelity and only they, not the children, are able to act to ensure that the biological ties they may deem essential are present.... The law should discourage adults from treating children they have parented as expendable when their adult relationships fall apart. It is the adults who can and should absorb the pain of betrayal rather than inflict additional betrayal on the involved children.

Theresa Glennon, *Expendable Children: Defining Belonging in a Broken World*, 8 DUKE J. GENDER L. & POL'Y 269, 281–82 (2001).

are of the firm belief—in terms of common law decision making—that this remains the proper, overarching litmus, at least in the wider range of cases.

Undeniably, while perhaps children of broken homes have been freed from some of the stigma of previous social environments, they still face significant challenges. From the perspective of one pair of commentators:

> Marriage once served as a system designed to channel childrearing into two-parent families and keep it there. Within this system, the marital presumption discouraged efforts to inquire too closely into the circumstances that might rebut a husband's paternity and the stigma against nonmarital births. . . . Today, the messy facts of biology are only too plain to see. Forty-one percent of American births are nonmarital and may give rise to fights over parentage and support. Americans lead the world in family instability, cohabiting, splitting, marrying, and divorcing, and, as a consequence, involve a host of unmarried parents, stepparents, and others in children's lives to a greater degree than in most of the rest of the developed world. And almost every parent who chooses to do so can discover the truth of biological parenthood, whether or not a court choses to admit the evidence.

June Carbone & Naomi Cahn, *Marriage, Parentage, and Child Support*, 45 Fam. L.Q. at 219 (footnotes omitted).

Even in the landscape of modern science, Pennsylvania courts have remained reluctant to abandon wholesale the common law presumptions and dictates, as they reflect ideals, aspirations, and mandates in furtherance of the best-interests objective. *Accord Dye v. Geiger*, 554 N.W.2d 538, 541 (Iowa 1996) ("We hope that [the husband's] heart will follow his money."); *Godin*, 725 A.2d at 911 (aiming not to deprive the child of, at least, "the legal and financial benefits of a parental relationship"); Niccol Kording, *Nature v. Nurture: Children Left Fatherless and Family–Less When Nature Prevails in Paternity Actions*, 65 U. Pitt. L.Rev. 811, 851 (2004). Experience shows, nonetheless, that, even subject to every compulsion of the law, some legal parents simply will not fulfill their

nurturing and/or financial support obligations, whether on account of obstinacy, inability, or some other factor or factors. The legal determination of parentage is a hollow one where the accoutrements do not inure to a child's benefit.

█ In light of the above, it is our considered view that the determination of paternity by estoppel should be better informed according to the actual best interests of the child, rather than by rote pronouncements grounded merely on the longevity of abstractly portrayed (and perhaps largely ostensible) parental relationships. We realize the common pleas court's decision-making process was informed by an evolving set of appellate court decisions which, in many respects, are difficult to reconcile. Nevertheless, while in the past, the balancing of competing public policy and human concerns has been accomplished on generalized terms, the modernization of our common law (again, in the absence of specific legislative guidance) requires a more specific focus than was accorded here.

Significantly, whereas the common pleas court suggested that the present record is extensive, in fact, it is very sparse in terms of G.L.M.'s best interests. The record offers very little feel for the closeness of G.L.M.'s relationship with H.M.M. Correspondingly, we have no sense for the harm that would befall G.L.M. if H.M.M.'s parental status were to be disestablished, either fully or, as some intermediate court decisions are now suggesting is permissible, partially (*i.e.*, for purposes of support). *But see Michael H. v. Gerald D.*, 491 U.S. 110, 118, 109 S.Ct. 2333, 2339, 105 L.Ed.2d 91 (1989) (plurality) (indicating that the law of one state "like nature itself, makes no provision for dual fatherhood").

█ Implementation of a common law scheme encompassing paternity by estoppel vindicating the best interests of children in paternity disputes on an individualized basis will obviously require development through multiple cases as different fact patterns arise. *See supra* note 4. In terms of guidance, however, absent undue hardship or impossibility, we do not believe a court should dismiss a support claim against a

purported biological father based on an estoppel theory vesting legal parenthood in another man without the latter being brought before the court at least as a witness. Moreover, certainly, the common pleas court has the authority to appoint a guardian *ad litem* to advocate the child's best interests in concrete terms. *Cf. Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 387 S.E.2d 866, 873 (1989) (requiring the appointment of such a guardian in paternity disputes).

■■■ The legal fictions perpetuated through the years (including the proposition that genetic testing is irrelevant in certain paternity-related matters) retain their greatest force where there is truly an intact family attempting to defend itself against third-party intervention. *See, e.g., Strauser*, 556 Pa. at 83, 726 A.2d at 1052. In cases involving separation and divorce, we direct that the Uniform Act on Blood Tests to Determine Paternity is now to be applied on its terms insofar as it authorizes testing.[8] At the very least, the identification of G.L.M.'s biological father is a relevant fact for purposes of determining who should pay for the services of a guardian *ad litem* to vindicate G.L.M.'s best interests.[9] A biological father can do at least this much.

Additionally, recognizing the common pleas court's good intentions in attempting to incentivize reconciliation between Appellant and H.M.M., the parties were separated as of the time of the support, and with apparent good reason. The abstract possibility that the marital unit might be saved, in these circumstances, is not, in our view, a strong reason supporting the dismissal of the claim for support from Appellee.

■■■ Finally, in the wide range of instances with which our common pleas courts are presented, we realize that there will

8. In terms of the presumption of paternity, this is already the effect of existing decisions explaining that the presumption no longer applies in the context of non-intact marriages. *See, e.g., Fish*, 559 Pa. at 528, 741 A.2d at 723.

9. While at this time we do not hold that a guardian *ad litem* is necessarily required in all cases, at this juncture in the present case, we believe an appointment is advisable.

be children of broken marriages who may never enjoy the supportive relationship with either "psychological" or biological fathers.[10] All things being equal in this regard, we conclude that the responsibility for fatherhood should lie with the biological father.[11] To the degree the equities come into play (after consideration of the child's best interests), continuing deception potentially relevant to a husband's continuance in a marriage may be a relevant factor, even where the fraud is short of the typical scenario discussed infra, see *supra* note 7. *Cf. J.C. v. J.S.*, 826 A.2d 1, 4 (Pa.Super.2003) (permitting the presumed father to "preclude the application of paternity by estoppel" where there is evidence of fraud or misrepresentation on behalf of the person attempting to invoke the doctrine).[12]

In summary, paternity by estoppel continues to pertain in Pennsylvania, but it will apply only where it can be shown, on a developed record, that it is in the best interests of the involved child. The dismissal of the support claim in this

10. We certainly know that children benefit psychologically, socially, and educationally from predictable parental relationships. *See, e.g., In re Paternity of Cheryl*, 434 Mass. 23, 746 N.E.2d 488, 495 n. 15 (2001) (collecting sources). However, as much as courts may wish to incentivize noble behavior, we appreciate that there are other factors in play. *See, e.g., id.* at 498 ("We harbor no illusion that our decision will protect [the child] from the consequences of her father's decision to seek genetic testing and the challenge his paternity[;] ... [n]o judgment can force him to continue to nurture his relationship with [her]...."); *accord* Brief for Appellee at 20 ("This counsel is continuously amazed by what some parents will say or do to their own children in the heat of a divorce.").

11. Some of the discomfort with common law decision making in this arena is that there may be federal or state constitutional interests at stake. Notably, we are not presented here with such concerns in the parties' arguments, other than on the most general terms within Appellee's equal-protection overlay.

12. While our decision here reflects increased flexibility in the application of the paternity by estoppel doctrine, we note that courts have been most firm in sustaining prior adjudications (or formal acknowledgments) of paternity based on the need for continuity, financial support, and potential psychological security arising out of an established parent-child relationship. *See, e.g., Godin*, 725 A.2d at 910; *Paternity of Cheryl*, 746 N.E.2d at 495–97.

case will not be sustained in the absence of a closer assessment.

The order of the Superior Court is reversed, and the matter is remanded for further proceedings consistent with this opinion.

Jurisdiction is relinquished.

Chief Justice CASTILLE, Justices EAKIN, TODD and ORIE MELVIN join the opinion.

Justice ORIE MELVIN files a concurring opinion.

Justice BAER files a dissenting opinion in which Justice McCAFFERY joins.

Justice ORIE MELVIN, concurring.

I join in the Majority's decision promoting the continuing viability of the estoppel doctrine in Pennsylvania common law where the record reveals that it is in a child's best interest. It has been my observation that the focus in paternity cases should be on the child, not the adults, who obviously are making choices irrespective of anyone else's best interests, least of all the child conceived as a result of an extra-marital affair. I write to comment on two matters. First, while the Majority acknowledges the absence of "definitive legislative involvement," Majority Opinion, at 524, 38 A.3d at 807; *see also id.* at 525–528, 38 A.3d at 808–09, I believe the General Assembly should consider creation of relevant legislation. Second, I wish to emphasize my motivation to remand this case, rather than affirm it, due in large part to my reluctance to develop decisional law based upon the sparse, incomplete, and utterly unacceptable record certified to this Court on appeal.

The Majority has referenced that during Mother's pregnancy with G.L.M. ("Child"), born on July 30, 2006, Mother informed her husband, H.M.M., that he might not be the father of Child and that P.C.S., Appellee, with whom she had an extramarital affair that began sometime in 2004, might be the biological father. Despite this revelation, Mother and H.M.M. continued to reside together.

H.M.M. was present at Child's birth, but he refused to sign the birth certificate. DNA testing that occurred soon after Child's birth confirmed that H.M.M. was not Child's biological father. Mother and H.M.M. remained together for almost four years after Child's birth, ultimately separating in late June 2010. During this four-year period, H.M.M. participated in raising Child, provided emotional and financial support, and engaged in other fatherly behavior. Child, who was given H.M.M.'s surname, referred to H.M.M. as "daddy."

Also during this four-year period, Mother and Appellee surreptitiously continued their affair. At times, Child was present with Mother and Appellee. Although Mother and Appellee attempted to end their relationship periodically between July 2006 and May 2010, after periods of no contact for three or four months, they invariably resumed the affair. In late May 2010, however, Appellee finally ended the relationship with Mother. Mother filed a support action against him, while continuing to reside with H.M.M. Mother and H.M.M. ceased living together on June 26, 2010.

In his motion to dismiss the support action, Appellee denied paternity and contended, in part, that Mother was estopped from seeking support from him. Following a hearing on August 5, 2010, the trial court issued an order on August 25, 2010, granting Appellee's motion. The court reasoned that Mother was precluded from seeking child support from Appellee due to the applicability of both the presumption of paternity and the doctrine of paternity by estoppel. The Superior Court affirmed in an unpublished memorandum. *K.E.M. v. P.C.S.*, No. 1566 MDA 2010 (Pa.Super., filed Apr. 21, 2011). Although it concluded that the trial court erred in applying the presumption of paternity, it deemed the error harmless because the trial court also determined that Mother was estopped from pursuing a support action against Appellee. With respect to estoppel, the Superior Court noted that since H.M.M. held Child out to be his own and provided support, Mother was estopped from suing a third party for support based on the third party's biological status. *K.E.M.*, unpublished memorandum at 5 (citing *J.C. v. J.S.*, 826 A.2d 1, 3–4

(Pa.Super.2003)). Based on this principle, the Superior Court concluded that the evidence presented at the hearing established that Mother and H.M.M. accepted H.M.M. as Child's father. It pointed out, *inter alia*, that until the time Mother and H.M.M. separated, Mother told no one except H.M.M. and Appellee that H.M.M. was not Child's biological father.[1] The court thus determined that Mother was estopped from seeking support from Appellee.

President Judge Emeritus McEwen filed a dissenting statement, in which he found support for reversal of the trial court on the estoppel issue based upon *Vargo v. Schwartz*, 940 A.2d 459 (Pa.Super.2007), a decision authored by now-Justice McCaffery when he was on the Superior Court. Judge McEwen stated:

> The "best interests" of the child in this case are not, in my view, met by a holding which will find a child left without the source of support to which he would otherwise be entitled. A caring and just society should not be seen to condone or even permit the fathering of a child without the presumptive responsibility to contribute to the care of that child, and where the application of the doctrine of paternity by estoppel interferes with that responsibility, it would wisely be abrogated.

*K.E.M.*, unpublished memorandum (McEwen, P.J.E., dissenting, at 1). Judge McEwen called upon this Court to re-examine this area of law to determine whether advances and changes in modern science and society should inspire a different result. We granted Mother's petition for allowance of appeal.

Both the Majority and Dissent point out that the estoppel doctrine creates forced, sometimes fictional, parenthood and is predictably unfair where a spouse is deceived concerning the rightful parentage of a child. In 2012, in light of the accuracy of genetic testing, it is especially difficult to accept this legal fiction. Protection of the best interests of the child, however, is the ultimate goal, and the Majority clearly emphasizes this

---

1. Actually, Mother testified she told her two grown daughters that H.M.M. was not Child's father. N.T., 8/5/10, at 25, 32.

fact. It is not difficult to envision the various scenarios where application of the doctrine seemingly protects children; indeed, our case law is replete with such vignettes. In reality, though, at times, the child ultimately has no father legally required to support him. *See, e.g., Barr v. Bartolo*, 927 A.2d 635 (Pa.Super.2007) (legal father evaded support obligation by proving he was not the child's biological father, and biological father was permitted to avoid support obligation by successfully arguing the legal father was estopped from denying paternity). It is infrequent, if not rare, that a child born into such a scenario claims protection from the emotional impact of learning that the man he "knew" as his father actually is a "legal" stranger. Relatives, neighbors, and parents tell the child the truth about his parentage, the very truth that the doctrine claims to protect. The doctrine is a fiction in the law that has been in place for decades, with a sound purpose, for all of the reasons asserted by the Majority. Indeed, the Dissent's suggestion that application of the doctrine in the instant case leads to an inequitable result by "punishing the husband for the laudable conduct of affording emotional and financial support to the child of his wife, even after he discovered that the child was not his issue," Dissenting Opinion, (J. Baer), at 535, 38 A.3d at 814, ignores the very purpose behind paternity by estoppel. It is that very conduct by H.M.M. that the estoppel doctrine acknowledges, supports, and upholds for the sake of the child. It is that very conduct by H.M.M. that the doctrine prevents H.M.M. from avoiding since he assumed it for four years knowing that the child was not his issue. Protection of the child is paramount, and I lend my voice to those calling for the Legislature to specify factors to consider in making paternity determinations. "Such legislation ... would foster transparency and public confidence and would make trial court adjudication more flexible and more disciplined at the same time." David N. Wecht & Jennifer H. Forbes, *A Multi–Factor Test Would Aid Paternity Decisions*, 82 PA.B.A.Q. 3, 118 (2011).

Next, while the Majority advises that the estoppel doctrine can apply "only where it can be shown, on a developed record," that it is the child's best interests, Majority Opinion

at 529, 38 A.3d at 810, the sparseness of the record before us demonstrates, in my view, why the matter must be remanded. The August 5, 2010 hearing was brief, consuming only forty pages of notes of testimony. Mother and her minister were the only two witnesses; neither H.M.M. nor Appellee testified. Appellee argues in his brief that his relationship with Child was minimal, he was alone with Child only once, and he discouraged Mother's efforts to have Child call him "daddy." Thus, he contends that any relationship with Child existed only in Mother's imagination. The meager testimony Mother presented regarding Child's relationship with H.M.M. suggests that she and H.M.M. publicly held H.M.M. out as Child's father despite both knowing that it was untrue. Conversely, while there indeed was some contact between Appellee and Child, it was not public acknowledgment, but private, secretive interaction.

This child is young; he was born in 2006. The Majority acknowledges that Mother averred in her brief that Child knows H.M.M. is not his father. Majority Opinion at 517, 38 A.3d at 803. There is no such testimony at the 2010 hearing. In fact, there is virtually no testimony regarding H.M.M.'s role with Child subsequent to Mother's and H.M.M.'s separation, **if** that is indeed relevant to the doctrine's applicability. Nearly all of the testimony related to the parties' interactions before Appellee broke off the affair and H.M.M. separated from Mother. Moreover, since neither H.M.M. nor Appellee testified, the only testimony in the record came from Mother.

As noted by the Majority, the record is "very sparse in terms of [Child's] best interests." Majority Opinion, at 527, 38 A.3d at 809. I wholeheartedly support the Majority's predilection that a court should not "dismiss a support claim against a purported biological father based on an estoppel theory vesting legal parenthood in another man without the latter being brought before the court at least as a witness." *Id.* at 527–528, 38 A.3d at 809. Accordingly, I concur.

Justice BAER, dissenting.

I applaud the Majority for recognizing the need for a more case-specific approach to paternity by estoppel determina-

tions—a development in the law that I view as long overdue. The Majority engages in an astute analysis, and takes an important step in the right direction by limiting the application of paternity by estoppel to cases where it serves the best interests of the child. Nevertheless, I am compelled to dissent because, left to my own devices, I would abrogate the doctrine in its entirety, with the limited exception of where its invocation would preserve the status of a husband who chooses to parent a non-biological child born into an existing marriage. Absent the scenario where mother's husband willingly undertakes parental responsibility of his wife's child and desires to maintain it, I see no reason to perpetuate the legal fiction that the individual who cared for the child is the parent.

I find that in today's world, the justifications supporting the doctrine exist only when the mother's husband wishes to continue parenting his non-biological child. These justifications are utterly unconvincing when applying the doctrine to the circumstances presented herein, where the biological father is attempting to avoid the imposition of a support obligation. I find also that application of paternity by estoppel in the instant case leads to inequitable results as it permits the biological father[1] to evade his parental obligations, while punishing the husband for the laudable conduct of affording emotional and financial support to the child of his wife, even after he discovered that the child was not his issue.

A recurring theme justifying the historical application of paternity by estoppel is that children should be secure in knowing who their parents are, and should not be traumatized by the discovery that the father they have known is not, in fact, their father. See Majority Opinion at 513–515, 38 A.3d at 801–02 (citing Fish v. Behers, 559 Pa. 523, 741 A.2d 721, 724 (1999)). Similarly, the Majority cites to the proposition that "the law cannot permit a party to renounce even an assumed duty of parentage when, by doing so, the innocent child would

1. I acknowledge that genetic testing has not confirmed that P.C.S. is the biological father of the child; however, the parties appear to agree that such is the case. Thus, I refer to him, for purposes of argument, as the biological father.

be victimized." Majority Opinion at 525, 38 A.3d at 807 (quoting *Commonwealth ex rel. Gonzalez v. Andreas*, 245 Pa.Super. 307, 369 A.2d 416, 419 (1976)).

While these views were perhaps forceful before genetic testing could identify a biological father with pragmatic certainty, and when being born out of wedlock carried an onerous stigma, they are of little consequence today, considering that paternity can now be established readily and conclusively, and commentators estimate that forty-one percent of American births are non-marital. Majority Opinion at 526–527, 38 A.3d at 808–09 (citing June Carbone & Naomi Cahn, *Marriage, Parentage, and Child Support*, 45 FAM. L.Q. 219 (2011)). Moreover, it is naïve to believe that adults will not tell their child his true parentage, assuming the child is old enough to understand the issue. Thus, realistically speaking, the idea that the child will not discover the identity of his father seems absurd. Equally unavailing is the idea that the child will be more victimized by calling upon his biological father to support him, than he would be by forcing his mother's husband to carry out such obligations. In my view, the only time these realities will not occur is when the mother's husband desires to maintain and develop the parental relationship. Thus, I would adhere to the retention of paternity by estoppel in that lone circumstance.

Moreover, as mentioned at the outset, permitting invocation of paternity by estoppel as a defense by the biological father in a child support action leads to inequitable results. The mother's husband, attempting to save his marriage and perhaps his family, welcomes the child into the family home, and treats the child as his own. He calls the child by endearments, and the child calls him "Daddy." He supports the child financially and emotionally. Nevertheless, the marriage cannot be saved. For his efforts, the doctrine of paternity by estoppel imposes upon mother's husband the obligation to support the child until he reaches adulthood. The message that is being sent to the husband who finds himself in such a predicament is clear—do not allow the child to call you "Daddy," do not lavish any affection on the child, do not spend money on the child, and tell everyone you know that the child

is not yours. How does such conduct help the child, or, for that matter, assist the husband and mother in attempting to save a troubled marriage? How does it benefit their additional children who barely understand what the controversy is about, and know only that another sibling has been added to their home?

I would favor an approach that would bring about the opposite result. I would encourage mother's husband to bring the child into their home, and to provide emotional and financial stability for the child. I would encourage mother and her husband to attempt to save their marriage and to maintain their family. If, in the end, such efforts prove futile, absent the scenario where the husband wants to maintain the parental relationship notwithstanding the lack of biological parentage, I would require mother to turn to the biological father for child support.

A similar observation was made by Justice McCaffery in an opinion he authored while serving on Superior Court. In *Vargo v. Schwartz*, 940 A.2d 459 (Pa.Super.2007), the mother was having an affair while married to her husband, which resulted in the birth of two daughters. Admittedly unlike the instant case, the mother perpetrated fraud on her husband by misrepresenting that the girls were her husband's biological children. When the husband ultimately discovered the true parentage of the children, the couple separated, and the husband disavowed his parentage by telling "everyone" that he was not the children's biological father. *Id.* at 469. Admirably, however, the husband continued to support the mother and children economically and to provide care and nurturing to the children.

The mother in *Vargo* subsequently filed for support against the biological father (*i.e.,* the man with whom she had an affair). As in the instant case, the biological father asserted the doctrine of paternity by estoppel in defense, and attempted to use the husband's kindness in caring for the children against him. The biological father alleged that he had no obligation to pay support because, *inter alia,* the husband, after learning that he was not the children's biological father,

had continued to nurture the young girls and maintain them on his health insurance policy to ensure that they would receive medical care. The trial court rejected the biological father's contention, concluding that the mother was not estopped from seeking support from him.

Finding no abuse of discretion in the trial court's ruling, Justice, then-Judge, McCaffery recognized cogently the "serious issues of fairness" that would arise where application of paternity by estoppel would "punish the party that sought to do the right thing and reward the party that perpetrated a fraud." *Vargo*, 940 A.2d at 469. He stated, "[w]e do not read our law to require acts that place children at risk or in need of life's basic necessities in order to reinforce the legal point that one is not financially responsible for those children." *Id.* at 470.

Justice McCaffery's thoughtful sentiments ring true here, notwithstanding that the mother revealed the true parentage of the child to her husband. Otherwise, as noted, the message we are sending to husbands is to abandon promptly all care, financial or otherwise, of a child born to a marriage once he discovers that he is not the biological father, or risk having to pay support for such child until he reaches majority. This in no way furthers a policy that is in the best interests of the child. This Court should encourage, rather than sanction, supportive conduct on the part of husbands who find themselves in the precarious situation as set forth herein.

In conclusion, in most cases, applying the doctrine of paternity by estoppel simply does not protect the child. Adults in today's world will discover who the biological father is. When that happens, the child will generally be told as soon as he is old enough to understand. Thus, the law should encourage the mother's husband to try to maintain the intact marriage and amalgamate the child by a different father into the family home. If this fails, the mother's husband's efforts should be recognized, and paternity by estoppel should be invoked if he desires to maintain the parental relationship. Otherwise, mother's husband should not be punished for "doing the right thing." In such circumstances, the mother should be required

to turn to the biological father, who, being able to father the child, should also be required to support him.

Accordingly, I dissent from the Majority's remand for further proceedings to determine whether the doctrine of paternity by estoppel applies, and would hold, as a matter of law, that Appellee may not invoke the doctrine as a defense to Appellant's support action.

Justice McCAFFERY joins this Dissenting Opinion.